**NOTICE: SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion. Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision. Slip opinions can be changed by subsequent court orders. For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion. Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports. An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.** The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports. Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

FILE

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE SEP 0 3 2015

_Madsen, C.J._
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on Sept 3, 2015

_Ronald R. Carpenter_
Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| J.S., S.L., and L.C., | ) | |
| | ) | |
| Respondents, | ) | No. 90510-0 |
| | ) | |
| v. | ) | |
| | ) | |
| VILLAGE VOICE MEDIA HOLDINGS, | ) | |
| L.L.C., d/b/a/ Backpage.com and | ) | En Banc |
| BACKPAGE.COM, L.L.C., | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BARUTI HOPSON and NEW TIMES | ) | |
| MEDIA, L.L.C., d/b/a/ Backpage.com, | ) | Filed ___SEP 0 3 2015___ |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

GONZÁLEZ, J.—The plaintiffs before us have been the repeated victims of horrific acts committed in the shadows of the law. They brought this suit in part to bring light to some of those shadows: to show how children are bought and sold for sexual services online on Backpage.com in advertisements that, they allege, the defendants help develop. Federal law shields website operators from state law

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

liability for merely hosting content developed by users but does not protect those who develop the content. The plaintiffs allege that the defendants did more than just provide a forum for illegal content; the plaintiffs allege the defendants helped develop it. Taking the complaint as true, as we must at this point, we find that the plaintiffs have alleged sufficient facts that, if proved, would show that the defendants helped to produce the illegal content and therefore are subject to liability under state law. Accordingly, we affirm and remand to the trial court for further proceedings consistent with this opinion.

## FACTS

Advertisements featuring three minor girls, J.S., S.L., and L.C. (collectively J.S.), allegedly were posted on a website owned and maintained by Village Voice Media Holdings, d/b/a Backpage.com, Backpage.com LLC and New Times Media LLC, d/b/a/ Backpage.com (collectively Backpage). J.S. allegedly was raped multiple times by adult customers who responded to the advertisements.

J.S. filed a complaint alleging state law claims for damages against Backpage and Baruti Hopson.[1] J.S. asserted claims for negligence, outrage, sexual exploitation of children, ratification/vicarious liability, unjust enrichment, invasion of privacy, sexual assault and battery, and civil conspiracy. Backpage moved to

---

[1] Hopson was found guilty of raping, assaulting, and prostituting one of the plaintiffs. J.S. did not pursue its action against Hopson. Appellant's Opening Br. at 7 n.2.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

dismiss on the theory that it is immune from suit in relation to J.S.'s state law claims under the federal Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230.[2] J.S. countered by arguing that Backpage is not immune from suit in part because its advertisement posting rules were "designed to help pimps develop advertisements that can evade the unwanted attention of law enforcement, while still conveying the illegal message." Clerk's Papers (CP) at 201. The trial court denied the motion to dismiss, allowing J.S.'s case to proceed. Backpage moved for discretionary review. The Court of Appeals granted review and certified the case to this court for direct review. Order Certifying Case for Transfer, *J.S. v. Vill. Voice Media Holdings, LLC*, No. 44920-0-II (Wash. Ct. App. July 17, 2014).

J.S. allegedly was featured in Backpage advertisements posted in accordance with instructions on Backpage's website without any special guidance from Backpage personnel. J.S. alleges that all of the advertisements featuring J.S. complied with Backpage's content requirements.

Backpage does not allow advertisements on its website to contain naked images, images featuring transparent clothing, sexually explicit language, suggestions of an exchange of sex acts for money, or advertisements for illegal services. In addition to these rules, specifically for advertisements posted in the

---

[2] Backpage removed this case to a federal district court based on diversity jurisdiction. That court remanded to state court.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

"'escort'" section of its website, Backpage does not allow "any solicitation directly or in 'coded' fashion for any illegal service exchanging sexual favors for money or other valuable consideration," "any material on the Site that exploits minors in any way," or "any material . . . that in any way constitutes or assists in human trafficking." CP at 9-10.

ANALYSIS

A. *Standard of Review*

"A trial court's ruling to dismiss a claim under CR 12(b)(6) is reviewed de novo." *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007) (citing *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998)). At this stage, "we accept as true the allegations in a plaintiff's complaint and any reasonable inferences therein." *Reid v. Pierce County*, 136 Wn.2d 195, 201, 961 P.2d 333 (1998) (citing *Chambers-Castanes v. King County*, 100 Wn.2d 275, 278, 669 P.2d 451 (1983); *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 961, 577 P.2d 580 (1978)). "CR 12(b)(6) motions should be granted 'sparingly and with care' and 'only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'" *Cutler v. Phillips Petrol. Co.*, 124 Wn.2d 749, 755, 881 P.2d 216 (1994) (quoting *Hoffer v. State*, 110 Wn.2d 415, 420, 755 P.2d 781 (1988)). "Dismissal under CR 12(b)(6) is appropriate only if 'it appears beyond a reasonable doubt that no facts

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

exist that would justify recovery.'" *In re Parentage of C.M.F.*, 179 Wn.2d 411, 418, 314 P.3d 1109 (2013) (quoting *Cutler*, 124 Wn.2d at 755).

B. *Federal Preemption*

J.S. alleges that Backpage facilitated the violation of numerous Washington laws, including violations of Washington's laws against trafficking, commercial sexual abuse, and prostitution.[3]

Federal law, however, preempts state law when state law "would stand 'as an obstacle to the accomplishment of the full purposes and objectives of Congress' in passing § 230 of the CDA." *Zeran v. Am. Online, Inc.*, 958 F. Supp. 1124, 1134 (E.D. Va. 1997) (quoting *English v. Gen. Elec. Co.*, 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990)), *aff'd*, 129 F.3d 327 (4th Cir. 1997), *cert. denied*, 524 U.S. 937 (1998). Applicable here, the CDA provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3).

---

[3] RCW 9.68A.040 (sexual exploitation of a minor), .050 (dealing in depictions of minor engaged in sexually explicit conduct), .090 (communication with a minor for immoral purposes), .100 (commercial sexual abuse of a minor), .101 (promoting commercial sexual abuse of a minor), .103 (permitting commercial sexual abuse of a minor); RCW 9A.44.076 (rape of a child in the second degree), .079 (rape of a child in the third degree), .086 (child molestation in the second degree), .089 (child molestation in the third degree); RCW 9A.88.070 (promoting prostitution in the first degree), .080 (promoting prostitution in the second degree), .090 (permitting prostitution); RCW 9A.40.100 (trafficking); and RCW 9A.28.040 (criminal conspiracy); RCW 9A.82.060 (leading organized crime).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Under the CDA, an "information content provider"[4] may be subject to state law liability in relation to content that it develops but an "interactive computer service"[5] is immune from suit for state law claims in relation to merely hosting such content on a website. *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003).

Accordingly, the CDA controls whether Backpage is immune from J.S.'s state law claims. The scope of CDA immunity is a matter of first impression for this court.

## C. *J.S.'s Claims Are Sufficient To Withstand the Motion To Dismiss*

This case turns on whether Backpage merely hosted the advertisements that featured J.S., in which case Backpage is protected by CDA immunity, or whether Backpage also helped develop the content of those advertisements, in which case Backpage is not protected by CDA immunity.

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is "responsible, in whole or in part" for creating or developing, the website is also a content provider. Thus, a

---

[4] An "information content provider" is "any person or entity responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

[5] An "interactive computer service," however, is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> website may be immune from liability for some of the content it displays to
> the public but be subject to liability for other content.

*Fair Hous. Council v. Roomates.com, LLC*, 521 F.3d 1157, 1162-63 (9th Cir.

2008) (citing *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal.

2006)). A website operator, however, does not "develop" content by simply

maintaining neutral policies prohibiting or limiting certain content. *See, e.g., Dart*

*v. Craigslist*, 665 F. Supp. 2d 961, 968-69 (N.D. Ill. 2009).

Viewing J.S.'s allegations in the light most favorable to J.S., as we must at

this stage, J.S. alleged facts that, if proved true, would show that Backpage did

more than simply maintain neutral policies prohibiting or limiting certain content.

Those allegations include that (1) "Backpage.com . . . has intentionally developed

its website to require information that allows and encourages . . . illegal trade to

occur through its website, including the illegal trafficking of underage girls," (2)

"Backpage.com has developed content requirements that it knows will allow pimps

and prostitutes to evade law enforcement," (3) "Backpage.com knows that the

foregoing content requirements are a fraud and a ruse that is aimed at helping

pimps, prostitutes, and Backpage.com evade law enforcement by giving the [false]

appearance that Backpage.com does not allow sex trafficking on its website," (4)

"the content requirements are nothing more than a method developed by

Backpage.com to allow pimps, prostitutes, and Backpage.com to evade law

enforcement for illegal sex trafficking, including the trafficking of minors for sex,"

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(5) Backpage's "content requirements are specifically designed to control the nature and context of those advertisements so that pimps can continue to use Backpage.com to traffic in sex, including the trafficking of children, and so Backpage.com can continue to profit from those advertisements," and (6) Backpage has a "substantial role in creating the content and context of the advertisements on its website." CP at 6, 8, 10, 12, 13. According to J.S., Backpage's advertisement posting rules were not simply neutral policies prohibiting or limiting certain content but were instead "specifically designed . . . so that pimps can continue to use Backpage.com to traffic in sex." *Id.* at 12.

Given J.S.'s allegations, it does not appear "'beyond a reasonable doubt that no facts exist that would justify recovery'" in this case, and, therefore, dismissal of J.S.'s claims under CR 12(b)(6) is not appropriate. *In re C.M.F.*, 179 Wn.2d at 418 (quoting *Cutler*, 124 Wn.2d at 755). It is important to ascertain whether in fact Backpage designed its posting rules to induce sex trafficking to determine whether Backpage is subject to suit under the CDA because "a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." *Fair Hous. Council*, 521 F.3d at 1168. Fact-finding on this issue is warranted.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

CONCLUSION

We find the plaintiffs have pleaded a case that survives the motion to dismiss. Accordingly, we affirm the trial court and remand for further proceedings consistent with this opinion.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

González, J.

WE CONCUR:

Madsen, C.J.

Stephens, J

Johnson, J.

_____, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 90510-0

WIGGINS, J. (concurring)—I fully concur in the majority opinion. CR 12(b)(6) motions should be granted "'sparingly and with care' and 'only in the unusual case in which plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.'" *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998) (quoting *Hoffer v. State*, 110 Wn.2d 415, 420, 755 P.2d 781 (1988)). These procedural rules "are intended to facilitate the full airing of claims having a legal basis." *Berge v. Gorton*, 88 Wn.2d 756, 759, 567 P.2d 187 (1977). Here, plaintiffs claim that Backpage.com[1] designed its posting rules to induce sex trafficking and to help pimps and prostitutes evade law enforcement. Thus, I would affirm the trial court and allow the plaintiffs to pursue their claims.

I write separately to emphasize that this holding implies that the plaintiffs' claims do not treat Backpage.com as the publisher or speaker of another's information under the Communications Decency Act of 1996 (CDA), 47 U.S.C. § 230(c). The dissent misreads this statute to provide "immunity" to "'interactive service providers.'" Dissent at 1. This reading is irreconcilable with the actual language of the statute, which does not include the term or any synonym of "immunity." Subsection 230(c)(1) instead provides a narrower protection from liability: the plain language of the statute creates a defense

---

[1] We refer to petitioners—Village Voice Media Holdings, d/b/a Backpage.com; Backpage.com LLC; and New Times Media LLC, d/b/a Backpage.com—collectively as Backpage.com.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

when there is (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker of information (3) that is provided by another information content provider.

Thus, when the cause of action does not treat an intermediary as a publisher or speaker, subsection 230(c)(1) cannot be read to protect that intermediary from liability. Plaintiffs' claims that Backpage.com created "content rules" specifically designed to induce sex trafficking and evade law enforcement do not treat Backpage.com as the publisher or speaker of another's information. Accordingly, I join the majority opinion.

## DISCUSSION

I.  Plain language of the statute precludes web hosts from being treated as publishers and speakers of third-party information

We begin by considering the plain language of the statute. Though subsection 230(c) has two parts, Backpage.com relies entirely on subsection 230(c)(1), captioned "Treatment of publisher or speaker."[2] (Boldface omitted.) Backpage.com ignores the second part, captioned "Civil Liability." (Boldface omitted.) Subsection 230(c) provides in full:

**(c) Protection for "Good Samaritan" blocking and screening of offensive material**

**(1) Treatment of publisher or speaker**

---

[2] *See* Appellant's Reply Br. at 15 n.11 ("Regardless of whether Section 230(c)(2) also applies, Backpage.com moved to dismiss under Section 230(c)(1), which contains no good faith element.").

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.[3]

## (2) Civil liability

> No provider or user of an interactive computer service shall be held liable on account of—

> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

The plain language of subsection 230(c) does two things: it precludes treating an interactive computer service provider as publisher or speaker of information provided by another provider, and it limits two distinct types of potential liability: (1) a provider or user cannot be subject to liability for any action taken in good faith to restrict access to materials considered to be objectionable, and (2) a provider or user cannot be subject to liability for any action taken to make it possible for any user to restrict access to material. However, the plain language of subsection 230(c)(1) does not, as Backpage.com and the dissent assert, create an "immunity."

---

[3] The terms "interactive computer service" and "information content provider" are statutorily defined in subsection 230(f)(3): an "interactive computer service" is defined to include all online service providers and websites, and an "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The plain language of subsection 230(c) permits liability for causes of action that do not treat the user or Internet service provider (ISP) as a publisher or a speaker. Backpage.com's argument that section 230 "provides broad immunity to online service providers" is wholly unsupported by the statute's plain language—subsection 230(c) says nothing about "broad immunity." Rather, subsection 230(c)(1) simply precludes treating the user or ISP "as the publisher or speaker of any information" if that information was "provided by another information content provider." If the elements of a cause of action include proof that an ISP is the publisher or speaker of information provided by another information content provider, then the action cannot proceed. But subsection 230(c)(1) does not protect the ISP from liability for other causes of action.

The context of subsection 230(c)(1) also compels the conclusion that it does not establish an immunity.  We must consider the context of the statute in discerning its meaning.  *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-12, 43 P.3d 4 (2002) (In interpreting a statute we "'tak[e] into account the statutory context, basic rules of grammar, and any special usages stated by the legislature on the face of the statute.'"(quoting 2A NORMAN J. SINGER, STATUTES AND STATUTORY CONSTRUCTION § 48A:16, at 809-10 (6th ed. 2000))). Subsection 230(c) includes two distinct subsections:

> **(c) Protection for "Good Samaritan" blocking and screening of offensive material**
>
> **(1) Treatment of publisher or speaker**
>
>    . . . .
>
> **(2) Civil liability**
>
>    . . . .

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The actual defenses against civil liability are found in subsection 230(c)(2). In other words, subsection 230(c)(1) is neither an immunity nor a defense; it is a prohibition against considering the provider as a publisher or speaker of content provided by another. The main purpose of subsection 230(c) is not to insulate providers from civil liability for objectionable content on their websites, but to protect providers from civil liability for limiting access to objectionable content. Ironically, the dissent would turn section 230 upside down, insulating plaintiffs from expanding access to objectionable content.

Backpage.com's reading, adopted by the dissent, totally ignores subsection 230(c)(2); the dissent instead asserts that good faith is irrelevant to subsection 230(c)(1). *See* dissent at 33-34. Whether or not that is correct, good faith is certainly relevant to subsection 230(c)(2), which expressly requires "good faith." We cannot just ignore this subsection—we read statutes in context and consider the statute's placement within the entire statutory scheme. *Campbell & Gwinn,* 146 Wn.2d at 9. Subsection 230(c)(2)(A) of the CDA protects providers from civil liability when they act in good faith to limit access to objectionable content, regardless of their status as a publisher or speaker. As discussed in more detail below, this provision clearly shows that Congress contemplated defenses for good faith actions that do not rely on an ISP's status as a publisher or speaker. But it would be absurd to ignore this language in order to protect the actions of Backpage.com, taken in bad faith, that have nothing to do with publishing or speaking another's content.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The purpose of the CDA provides further support for the conclusion that subsection 230(c)(1) does not provide "absolute immunity" to providers. Congress set forth its findings in subsection 230(a) and its resulting policies in subsection 230(b): promoting "the continued development of the Internet"; preserving "the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation"; encouraging the "development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services"; removing "disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material"; and ensuring "vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." 47 U.S.C. § 230(b).

Subsection 230(b) makes clear that Congress intended to remove disincentives to technologies that would restrict Internet access to objectionable materials. But Backpage.com would have us brush aside as irrelevant the subsection 230(c)(2) defenses that accomplish the congressional intent. Instead of encouraging all ISPs to incorporate restrictive technologies, this reading would absolutely immunize providers who allow third parties freedom to post objectionable materials on the providers' websites.

Rather than engaging with the plain language, structure, and purpose of section 230, Backpage.com relies on the opinions of various federal courts to conclude that the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

statute "'provides broad immunity for publishing content provided primarily by third parties.'" *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1118 (W.D. Wash. 2004) (quoting *Carafano v. Metrosplash.com, Inc.,* 339 F.3d 1119, 1123 (9th Cir. 2003)), *overruled on other grounds by Cosmetics Ideas, Inc. v. IAC/Interactivecorp*, 606 F.3d 612 (9th Cir. 2010). The dissent adopts this reading, asserting that it is following the reasoning of a majority of the courts to consider the question. Dissent at 8-9 & nn. 3-4. The dissent is correct that it is certainly not alone in taking this position—many courts, particularly in the early years after the statute was enacted, followed these early decisions in applying an expansive interpretation of the statute. Ryan J.P. Dyer, Comment, *The Communication Decency Act Gone Wild: A Case for Renewing the Presumption Against Preemption*, 37 SEATTLE U. L. REV. 837, 841-43 (2014); *see also, e.g., Zeran v. Am. Online, Inc.*, 129 F.3d 327 (4th Cir. 1997); *Green v. Am. Online*, 318 F.3d 465 (3d Cir. 2003). But it is difficult to reconcile an expansive reading finding "broad immunity" with the actual language of the statute, which uses specific terms and does not include the words "immunity" or any synonym. *Chi. Lawyers' Comm. for Civil Rights under Law, Inc., v. Craigslist, Inc.*, 519 F.3d 666, 669 (7th Cir. 2008). Perhaps recognizing this, the Ninth Circuit Court of Appeals has retreated from its earlier cases relied on by the dissent, joining other circuits in refusing to treat section 230 as providing broad immunity. *Compare Carafano,* 339 F.3d at 1123 (law "provides broad immunity for publishing content provided primarily by third parties"), *with Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009) ("[l]ooking at the text, it appears clear that neither

7

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

[subsection 230(c)] nor any other declares a general immunity from liability deriving from third-party content").

The dissent also supports its argument for broad immunity through repeated references to other courts' interpretations of the congressional intent in enacting section 230, "but such noise ultimately signifies nothing. It is the language of the statute that defines and enacts the concerns and aims of Congress; a particular concern does not rewrite the language." *Barnes,* 570 F.3d at 1105. I would hold that subsection 230(c)(1) creates a defense to, not an immunity from, liability arising from a cause of action that would treat the web host as a publisher or speaker.

## II. Treatment as publisher or speaker

With this approach in mind, we ask when subsection 230(c)(1) protects Backpage.com from liability. Some of the claims asserted by the plaintiffs treat Backpage.com as the publisher or original speaker of the pimps' offensive postings on their message board. These claims must be dismissed: the plain language of the subsection 203(c)(1) clearly protects Backpage.com from claims that would hold it liable for publishing or speaking another's information. *See, e.g., Zeran,* 129 F.3d at 333 (dismissal appropriate for both initial publication and delay in removal of defamatory messages); *Carafano,* 339 F.3d 1124-25 (dismissal appropriate for suit alleging invasion of privacy and defamation, among other things, based on third-party submission of false dating profile).

However, the plaintiffs also allege that Backpage.com's content rules were adopted and intended to assist pimps in using ambiguous language to avoid police

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

attention or to minimize the appearance that they are selling the sexual favors of their prostitutes. Specifically, plaintiffs complain that these content rules "are nothing more than a method developed by Backpage.com to allow pimps, prostitutes, and Backpage.com to evade law enforcement for illegal sex trafficking."[4] Clerk's Papers at 10. Plaintiffs argue that these content rules transform Backpage.com from a neutral intermediary hosting another's information into an original speaker of that information. *See, e.g., Fair Hous. Council v. Roommates.com, LLC,* 521 F.3d 1157, 1166 (9th Cir. 2008) (*Roommates.com*) ("By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of prepopulated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information."); *see also* Felix T. Wu, *Collateral Censorship and the Limits of Intermediary Immunity,* 87 NOTRE DAME L. REV. 293, 297 (2011). Plaintiffs also assert that Backpage.com specifically designed these rules to induce sex trafficking. These allegations require an analysis of (1) whether they treat Backpage.com as the original speaker of the information and (2) whether each cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another.

---

[4] Subsection 230(c)(2) protects ISPs who either (A) acting in good faith preclude access to objectionable material or (B) take action to allow others to preclude access to objectionable material. Content rules created in good faith fall within the protections of subsection 230(c)(2). However, plaintiffs allege that Backpage.com created these content restrictions in bad faith. Backpage.com does not rely on the defenses provided in subsection 230(c)(2). *See* note 2, *supra.*

*J.S., S.L., and L.C. v. Village Voice Media Holdings et al.,* No. 90510-0
(Wiggins, J., concurring)

The dissent would answer the first question by holding that the adoption of posting rules designed to induce sex trafficking does not make Backpage.com a "content developer" under the statute; i.e., Backpage.com is not the original speaker of the information. Dissent at 20. This may be true; many courts have held that content rules do not equal content development. *See, e.g., Dart v. Craigslist, Inc.,* 665 F. Supp. 2d 961, 963 (N.D. Ill. 2009); *Roommates.com,* 521 F.3d at 1171. But the real question is whether plaintiffs' allegations that Backpage.com developed posting rules to induce prostitution require us to treat Backpage.com as the publisher or speaker of another's information.

Backpage.com argues that plaintiffs' inducement theory clearly treats them as publishers and that holding it liable would punish the company for publishing third party content. To the contrary, plaintiffs have alleged a totally different theory—that Backpage.com guided pimps to craft invitations to prostitution that appear neutral and legal so that the pimps could advertise prostitution and share their ill-gotten gains with Backpage.com. Plaintiffs are not claiming that Backpage.com itself is acting as their pimp but that Backpage.com is promoting prostitution, which is a crime in Washington (RCW 9A.88.060) and should support a cause of action. The dissent does not analyze how these claims treat Backpage.com as a publisher or a speaker, relying instead on analogies to distinguishable cases. Unlike the cause of action in *Chicago Lawyers' Committee,* which relied on 42 U.S.C. § 3604(c),[5] an inducement theory does not require

---

[5] 42 U.S.C. § 3604 provides in relevant part that

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the defendant to act as a publisher. Nor does plaintiffs' theory involve "decisions relating to the monitoring, screening, and deletion of content"—actions that are "quintessentially related to a publishers role." *Green*, 318 F.3d at 471.

Factually, the dissent finds the most support for its position in *Dart*, 665 F. Supp. 2d 961. But *Dart* recognized that Craigslist "could be held liable for 'causing' discriminatory ads if that was in fact what it had done"; it simply disagreed with the petitioner's assertion that the mere existence of an "'adult services'" section necessarily induced others to provide unlawful content.[6] *Id*. at 968 (quoting *Chi. Lawyers' Comm.*, 519 F.3d at 671-72). Plaintiffs do not argue that Backpage.com necessarily induces the posting of unlawful content by merely providing an escort services category. Instead, plaintiffs allege that Backpage.com deliberately designed its posting rules in a manner

---

it shall be unlawful—

. . . .

    (c) To make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination.

[6] The dissent also cites to *Jane Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008) for support. Dissent at 22-23. *MySpace* involved a girl, 13, who lied about her age (claiming to be 18) in order to create a social networking profile. By lying about her age, she was able to create a public profile. Another user, 19, viewed this profile, initiated contact with the girl, and sexually molested her. The parents of the girl sued MySpace for negligence for the failure to have an age verification system in place and for the failure to keep younger users' profiles hidden. The Fifth Circuit Court of Appeals held that section 230 barred the claim. However, the court never explained how an age verification requirement would treat MySpace as the speaker or publisher of third-party information. *See* Wu, *supra*, at 327-28, 344. Notably, the plaintiff's claim was not one that would treat MySpace as if it had been the one claiming that the girl was 18. *Myspace*, 528 F.3d at 416. Instead, the claim faulted MySpace for its actions as the recipient of the girl's assertion rather than in its capacity as a speaker or publisher of that assertion to others. *See generally* Wu, *supra*, at 327-28. Rather than analyze the plain language, the court relied on the grant of broad immunity that we should reject as inconsistent with the plain language of section 230 to reach its holding. Thus, the analysis employed in *Myspace* is inapplicable to this case.

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that would enable pimps to engage in sex trafficking, including in the trafficking of minors, and to avoid law enforcement. These factual allegations do not suggest that Backpage.com is being treated as a "publisher or speaker." Accordingly, the plaintiffs' claim should not be dismissed under CR 12(b)(6).

The dissent further asserts that our interpretation of subsection 230(c)(2) "basically eviscerates § 230(c)(1) . . . by arguing that § 230(c)(2) provides the defendant with the defense, while § 230(c)(1) essentially provides the defendant with nothing." Dissent at 34. This is an empty rhetorical flourish and a strange one to make of this concurring opinion, which straightforwardly acknowledges that to the extent plaintiffs' claims treat Backpage.com as a publisher or original speaker, such claims "must be dismissed." *Supra* at 8. The dissent's rhetoric reveals its unwillingness to acknowledge that the plaintiffs make at least two claims: publishing advertisements treating the plaintiffs as chattels to be bought and sold over the Internet and crafting bad faith guidelines intended to create a plausible denial of the true nature of the services for which the plaintiffs were bought and sold—that is, promoting prostitution or inducing sex trafficking. Successfully defending against one of two claims does not "eviscerate" the remaining claim.

A simple analogy shows that defending against the publication claim does not defeat the bad faith guideline claim. A patient can bring a medical malpractice claim against a treating physician for at least two different claims—failure to adhere to the standard of care and failure to obtain informed consent to treatment. If the physician defeats the claim based on standard of care, the informed consent claim would remain

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

to be resolved. No one would say that the successful defense of the standard of care claim "provides the defendant with nothing," dissent at 34, or that the continued viability of the informed consent claim "eviscerates" the standard of care claim. *Id.* So too here the continued viability of the bad faith guidelines claim works no "evisceration."

Recognizing that the statute contains competing policy goals, recent circuit court decisions have protected "Good Samaritan" and neutral behavior while asserting that culpable behavior by websites is not protected under section 230.[7] *Roommates.com,* 521 F.3d at 1175 ("[t]he message to website operators is clear: if you don't encourage illegal content[] or design your website to require users to input illegal content," you will not be held liable for hosting third-party content). Courts specifically reject the subsection 230(c)(1) defense when the underlying cause of action does not treat the information content provider as a "publisher or speaker" of another's information. *See, e.g., City of Chicago v. StubHub!, Inc.,* 624 F.3d 363, 366 (7th Cir. 2010) (subsection 230(c)(1) defense inapplicable because suit to collected city's amusement tax "does not depend on who 'publishes' any information or is a 'speaker'"). More analogous to the instant case, the Ninth Circuit recently permitted a lawsuit against an ISP on a theory of

---

[7] Contrary to Backpage.com's argument that section 230 "unequivocally bars . . . claims seeking to impose liability on online service providers based on third-party content," courts do not uniformly immunize information content providers from suits based on unlawful content provided by third parties; currently eight circuits have explicitly left room for liability based on the inducement of illegal content. *See, e.g., Chi. Lawyers' Comm.,* 519 F.3d at 671-72; *Roommates.com,* 521 F.3d at 1175; *Fed. Trade Comm'n v. Accusearch, Inc.,* 570 F.3d 1187, 1199 (10th Cir. 2009); *Johnson v. Arden,* 614 F.3d 785, 792 (8th Cir. 2010); *MySpace,* 528 F.3d at 421-22; *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 257 (4th Cir. 2009); *Dimeo v. Max,* 248 F. App'x 280, 282 (3d Cir. 2007); *Universal Commc'n Sys., Inc. v. Lycos, Inc.,* 478 F.3d 413, 421 (1st Cir. 2007).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

promissory estoppel. *Barnes*, 570 F.3d at 1106-09.[8] These cases provide meaningful limitations on the defenses afforded by subsection 230(c)(1).

"The Communications Decency Act was not meant to create a lawless no-man's-land on the Internet." *Roommates.com,* 521 F.3d at 1164. The CDA instead prevents website hosts from being liable when they elect to block and screen offensive material, and it encourages the development of the Internet by not permitting causes of action, such as defamation, that would treat the web host as the publisher or speaker of objectionable material. Neither of these directives requires us to blindly accept the early premise of "broad immunity" in order to defeat potentially meritorious claims alleging flagrantly criminal complicity or inducement by website hosts on the Internet. We should interpret the statute to create a defense to, not an immunity from, liability arising from a cause of action that would treat the web host as a publisher or speaker. Because the plaintiffs' claims do not treat Backpage.com as a publisher or speaker, I join the majority in affirming the trial court's decision to deny Backpage.com's motion to dismiss.

---

[8] In *Barnes*, the plaintiff's former boyfriend posted nude photographs of the plaintiff on Yahoo!'s social media website without her permission, along with open solicitations to engage in sexual intercourse. 570 F.3d 1096. Barnes received numerous advances from unknown men in response to this profile and contacted Yahoo! to have the profile removed. Yahoo! did not remove the profile and Barnes filed a lawsuit alleging both the tort of negligent undertaking and a contract claim promissory estoppel for Yahoo!'s failure to remove the photographs. The court dismissed Barnes' tort claim, finding that "the duty that Barnes claims Yahoo violated derives from Yahoo's conduct as a publisher—the steps it allegedly took, but later supposedly abandoned, to de-publish the offensive profiles." *Id.* at 1103. However, the court permitted her claim to go forward under a claim of promissory estoppel because that claim treated Yahoo! as a promisor rather than as a publisher.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*J.S., S.L., and L.C. v. Village Voice Media Holdings et al.,* No. 90510-0
(Wiggins, J., concurring)

Accordingly, I concur in the majority opinion.

_____ Wiggins, J.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 90510-0

GORDON McCLOUD, J. (dissenting)—The question before us is whether

J.S.'s[1] civil lawsuit against these particular defendants can proceed or whether

federal law shields Backpage[2] from suit.    In 1996, Congress passed the

Communications Decency Act (CDA), 47 U.S.C. § 230, a statute that gives

"interactive service providers" such as Backpage immunity from lawsuits based on

the "content" of ads composed and posted on their sites by others. *See* 47 U.S.C. §

230(c)(1).  Before it passed this statute, Congress weighed the competing policies of

fostering robust interactive service provider growth, promoting self-policing by the

interactive service provider industry, and protecting against victimization by Internet

advertisements.  In the CDA, Congress struck the balance in favor of immunity for

"interactive service providers" but not for "content providers."

We must now decide whether Backpage fits within the CDA's broad

definition of an "interactive . . . service . . . provider" under subsection 230(c)(1),

---

[1] Minor plaintiffs—J.S., S.L., and L.C. (collectively J.S.).

[2] Village Voice Media Holdings, d/b/a Backpage.com; Backpage.com LLC; and
New Times Media LLC, d/b/a Backpage.com (collectively Backpage).

1

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

entitled to immunity from suit for content published on its website, or whether it is, instead, an "information content provider" that is not immune. The majority holds that J.S.'s complaint would support a claim that Backpage functions as an "information content provider" because it alleged that Backpage maintains content requirements for advertisements posted on its website that surreptitiously guide pimps on how to post illegal, exploitative ads. But J.S.'s complaint clearly alleges that another content provider, not Backpage, provided the content for the advertisements. J.S. thus seeks to hold Backpage liable as a publisher or speaker of that information. Subsection 230(c)(1) therefore bars J.S.'s claims. Accordingly, I would reverse the trial court's decision to deny the defendant's Civil Rule (CR) 12(b)(6) motion to dismiss the complaint. I respectfully dissent.

## FACTUAL ALLEGATIONS[3]

The complaint alleges that pimps posted advertisements displaying J.S. for sale for prostitution on the "escort" section of Backpage's website. Clerk's Papers (CP) at 1-2. Adult customers then responded to these advertisements and raped J.S. multiple times. CP at 2. The pimps posted these advertisements by using a computer; they had no personal contact with Backpage personnel. CP at 12.

---

[3] Because we review the trial court's denial of a CR 12(b)(6) motion, we presume that the complaint's factual allegations are true. *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 330, 962 P.2d 104 (1998).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The complaint further alleges that Backpage maintains content requirements for advertisements posted on its website and removes ads that violate these requirements. CP at 6. Backpage prohibits the use of sexually explicit language; naked images; images using transparent clothing, graphic box, or pixelization to cover bare breasts or genitalia; certain code words; suggesting an exchange of sex acts for money; and advertising an illegal service. CP at 8.

Users must also agree to certain content requirements to post advertisements on the "escort" section of the Backpage website. These requirements bar posting "obscene or lewd and lascivious graphics or photographs which depict genitalia or actual or simulated sexual acts"; "any solicitation directly or in 'coded' fashion for any illegal service exchanging sexual favors for money or other valuable consideration"; "any material on the Site that exploits minors in any way"; or "any material on the Site that in any way constitutes or assists in human trafficking." CP at 9-10. Backpage also requires users to agree that they are "at least 18 years of age or older and not considered to be a minor in my state or residence." CP at 10.

J.S. alleges that all of the advertisements about J.S. complied with Backpage's content requirements. CP at 16, 18, 20-21. We interpret this as an allegation that those advertisements complied with Backpage's requirements for language and images but failed to comply with Backpage's rules barring advertisements for illegal

3

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

services and exploitation of minors—because Backpage's alleged illegal exploitation of minors forms the gravamen of the complaint.

## PROCEDURAL BACKGROUND

On September 5, 2012, J.S. filed a first amended complaint, raising state law claims for damages against the current defendants plus Baruti Hopson, an alleged pimp. CP at 1-26.[4] J.S. asserted claims for negligence, outrage, sexual exploitation of children, ratification/vicarious liability, unjust enrichment, invasion of privacy, sexual assault and battery, and civil conspiracy. CP at 21-25. On March 25, 2013, Backpage filed a CR 12(b)(6) motion to dismiss; it argued that the CDA provided it with immunity from liability for Backpage's claims. CP at 155-84.

J.S. opposed, arguing, "Backpage engages in three distinct activities, each of which independently excludes CDA immunity." CP at 194. J.S. asserted that Backpage (1) "'created' its unlawful 'escort' heading," CP at 195-96 (formatting omitted), (2) "developed the unlawful content by making it 'useable and available,'" CP at 196-97 (formatting omitted), and (3) "encouraged unlawful content." CP at 197-204 (formatting omitted).

The trial court rejected J.S.'s first argument, explaining that a website could not be held liable for advertising for escorts because that is a legal activity. Verbatim

---

[4] Hopson is currently in prison for abusing and prostituting one of the plaintiffs. CP at 3-4, 2778. J.S. did not pursue its action against Hopson. Appellants' Opening Br. at 7.

4

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Tr. of Proceedings (VRP) at 23. The trial court also rejected J.S.'s second argument

that Backpage conspired with users. VRP at 15, 23, 50. But the court accepted J.S.'s

third argument—that Backpage's posting rules were "designed to help pimps

develop advertisements that can evade the unwanted attention of law enforcement,

while still conveying the illegal message." CP at 201. It therefore denied

Backpage's motion to dismiss, stating,

> [T]he question is did Congress tell Superior Court trial judges that you
> have to -- that you are entitled to ignore the CDA or do you have to
> enforce it? This case is -- honestly, this is, I think, of all the cases in
> terms of the [CR] 12(b)(6) or summary judgment for that matter, is the
> closest that I've ever come. I mean, it's right on the line and with all
> due respect to the fabulous briefing and the great arguments, it really
> walks the line for me this case, it's right on the edge. . . . These are
> where I'm most concerned, this is what I highlighted over and over
> again and reread, it's the posting guidelines.
>
> And, frankly, my note to myself in the sideline was Backpage
> doesn't know this is for prostitution and isn't assisting with the
> development? And despite the case law, I answer that question just on
> the side of the plaintiffs and I'm denying a [CR] 12(b)(6) [motion].

VRP at 49-50.

The Court of Appeals granted Backpage's motion for discretionary review

and then certified the case to this court for direct review under RCW 2.06.030.

## ANALYSIS

### I.    STANDARD OF REVIEW

This court reviews the denial of a CR 12(b)(6) motion to dismiss de novo.

*Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). We presume that all

5

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

facts alleged in the plaintiff's complaint are true. *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 330, 962 P.2d 104 (1998). But we are not required to accept the complaint's legal conclusions as correct. *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032, 750 P.2d 254 (1987). Dismissal is proper when it appears beyond a reasonable doubt that the plaintiff can prove no set of facts that would justify relief. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922 n.9, 296 P.3d 860 (2013).

II. THE CDA PROVIDES IMMUNITY TO INTERACTIVE COMPUTER SERVICE PROVIDERS OR USERS

A. The Language and Context of Subsection 230(c)(1)

The resolution of this case depends on our interpretation of a federal statute, 47 U.S.C. § 230(c). It provides:

**(1) Treatment of publisher or speaker**

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

**(2) Civil liability**

No provider or user of an interactive computer service shall be held liable on account of—

(A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

Subsection 230(c)(1)—the basis for Backpage's motion to dismiss—protects defendants from claims if (1) the defendant is an "interactive computer service . . . provider" or "user," (2) the cause of action treats the defendant as a publisher or speaker of information, and (3) a different information content provider provided the information. 47 U.S.C. § 230(c)(1). An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(f)(2). An "information content provider," on the other hand, is defined as any person or entity "responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3).

Subsection 230(e) of the CDA, titled "Effect on other laws," then provides a limited exception to the immunity described above for defendants in federal criminal prosecutions, even those brought under inconsistent or conflicting laws, but not for defendants in cases brought under inconsistent state laws:

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

**(1) No effect on criminal law**

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

. . . .

**(3) State law**

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. *No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.*

47 U.S.C. § 230(e) (emphasis added). As the majority acknowledges, the emphasized last sentence shows the limits of what is carved out, barring any state lawsuit that is based on a theory of liability "'inconsistent with this section.'" Majority at 5 (quoting 47 U.S.C. § 230(e)(3)). The "section" is section 230, whose first subsection, as discussed above, prohibits treating interactive computer service providers as "publisher[s] or speaker[s]," 47 U.S.C. § 230(c)(1). Its second subsection bars liability based on certain good faith content restrictions. 47 U.S.C. § 230(c)(2).

Most courts characterize subsection 230(c)(1)'s language treating Internet service providers as "publisher[s] or speaker[s]" of the content that they display as

8

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

providing an "immunity" from suit.[5] A few courts say that this language creates a protection from suit, rather than an absolute immunity.[6]

The concurrence finds the difference dispositive. Concurrence at 8 (holding that subsection 230(c) creates "a defense to, not an immunity from, liability arising from a cause of action that would treat the web host as a publisher or speaker").

I don't. Given the allegations in this particular case, the difference in terminology is irrelevant. The question is how far the subsection 230(c)(1) protection reaches, and courts interpreting subsection 230(c)(1)'s language

---

[5] *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 406-07 (6th Cir. 2014); *see also Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) ("The majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)); *accord Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir. 2010); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) ("'[I]mmunity is an immunity from suit rather than a mere defense to liability and . . . is effectively lost if a case is erroneously permitted to go to trial.'" (emphasis omitted) (quoting *Brown v. Gilmore*, 278 F.3d 362, 366 n.2 (4th Cir. 2002))); *Jane Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008); *Chi. Lawyers' Comm. for Civil Rights under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-19 (1st Cir. 2007); *Batzel v. Smith*, 333 F.3d 1018, 1026-30 (9th Cir. 2003); *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003); *Ben Ezra, Weinstein, & Co. v. Am. Online, Inc.*, 206 F.3d 980, 984-85 (10th Cir. 2000); *Zeran*, 129 F.3d at 330 ("By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.") *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090 (W.D. Wash. 2004), *overruled on other grounds by Cosmetics Ideas, Inc. v. IAC/Interactivecorp.*, 606 F.3d 612 (9th Cir. 2010).

[6] *See, e.g., John Doe v. GTE Corp.*, 347 F.3d 655, 660 (7th Cir. 2003) (reading "§ 230(c)(1) as a definitional clause rather than as an immunity from liability").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

uniformly hold that its protection for publishers is "quite robust." They apply an expansive definition of "'interactive computer service provider'" and a rather restrictive definition of "information content provider." *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003) (footnotes omitted). They hold that the law provides immunity if the plaintiff alleges that the defendant violated a duty deriving from the defendant's status or conduct as a publisher or speaker. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107-09 (9th Cir. 2009). As long as a third party "'willingly provides the essential published content, the interactive service provider receives full immunity regardless of the specific editing or selection process.'" *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1098-99, 1118 (W.D. Wash. 2004) (quoting *Carafano*, 339 F.3d at 1123). The inquiry is whether the defendant "function[ed] as an 'information content provider' for the portion of the statement or publication at issue." *Carafano*, 339 F.3d at 1123; *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 260 (4th Cir. 2009) (affirming district court's dismissal of complaint where plaintiff failed to show that defendant "was responsible for the creation or development of the allegedly defamatory content at issue").

As the majority notes, if a website operator is in part responsible for the creation or development of content, then it is considered an information content provider as to that content and loses immunity from claims predicated on such

10

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

content. Majority at 6-7; *Jones v. Dirty World Entm't Recordings, LLC*, 755 F.3d 398, 408-09 (6th Cir. 2014) (*Jones* III).

But critically for this case, a person or entity does not qualify as an information content provider merely by facilitating an individual user's expression of information, if it is the user alone who selects the content. *Carafano*, 339 F.3d at 1124.

### B. The Policy Choices Reflected in Subsection 230(c)(1)

J.S. argues, "Granting [i]mmunity to the Backpage [d]efendants at the CR 12(b)(6) [p]hase of [l]itigation [w]ould [r]esult [i]n [a]bsurdity" because Congress "did not intend to grant absolute immunity to websites let alone immunity to websites whose primary business is to generate profit from the sex trafficking of women and children." Br. of Resp'ts at 37 (boldface omitted). But J.S. provides no citations to congressional intent to support this argument.

The statute shows that Congress weighed the policy concerns at issue here differently. Subsection 230(b) of the CDA states,

It is the policy of the United States—

(1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

(2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

11

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(3) to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4) to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5) to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

47 U.S.C. § 230(b).

Section 230 thus puts a premium on two basic policy concerns: promoting the free exchange of information and ideas over the Internet, and encouraging voluntary monitoring for offensive or obscene material. *Carafano*, 339 F.3d at 1122; *Batzel v. Smith*, 333 F.3d 1018, 1026-30 (9th Cir. 2003). Congress was working against a backdrop of laws providing that publishers of media such as "'newspapers, magazines or television and radio stations'" *may* "'be held liable for publishing or distributing . . . material written or prepared by others.'" *Batzel*, 333 F.3d at 1026 (quoting *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998)). Section 230 intentionally treats Internet publishers "differently from corresponding publishers in print, television and radio." *Carafano*, 339 F.3d at 1122; *see also Batzel*, 333 F.3d at 1026-27.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In fact, Congress enacted the CDA to respond to *Stratton Oakmont, Inc. v. Prodigy Servs. Co.*, No. 31063/94, 1995 WL 323710, at *5 (N.Y. Sup. Ct. May 26, 1995), an unpublished state court decision that held that the provider of an online messaging board could be liable for defamatory statements that third party users posted on the board. *See Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008) (*Roommates*) (explaining Congress's concern about *Stratton Oakmont*). The court in *Stratton Oakmont* ruled that the online board administrator became a "publisher" when it deleted certain offensive third party postings and that it was therefore subject to liability for the content of defamatory messages that it did not remove. 1995 WL 323710, at *4-5. Congress criticized this decision for discouraging the Internet service provider from voluntarily filtering Internet content because that forum provider's efforts to remove objectionable content would trigger liability that the forum could avoid by doing nothing. *Roommates*, 521 F.3d at 1163. Thus, Congress was aware of competing policy concerns when enacting the CDA.

Many of the CDA decisions note these competing policy concerns. The courts, however, consistently acknowledge that Congress already weighed those competing policies when it enacted subsection 230(c)(1). In *PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069 (D.S.D. 2001), for example, a defamation action involving CDA immunity, the court described the conflict between facilitating the

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Internet's growth and preventing harm to individuals. It concluded that Congress erred on the side of favoring "robust [Internet] communication":

> [T]his case implicates some important issues of policy. On the one hand, the ability of individual users to log onto the Internet anonymously, undeterred by traditional social and legal restraints, tends to promote the kind of unrestrained, robust communication that many people view as the Internet's most important contribution to society. On the other hand, the ability of members of the public to link an individual's online identity to his or her physical self is essential to preventing the Internet's exchange of ideas from causing harm in the real world.
>
> The legislative resolution of these issues will, indirectly, shape the content of communication over the Internet. For now, the § 230 of the [CDA] errs on the side of robust communication, and prevents the plaintiffs from moving forward with their claims.

*Id.* at 1071-72 (citation omitted); *see also Batzel*, 333 F.3d at 1027, 1028 ("[T]here is an apparent tension between Congress's goals of promoting free speech while at the same time giving parents the tools to limit the material their children can access over the Internet. . . . The need to balance competing values is a primary impetus for enacting legislation. Tension within statutes is often not a defect but an indication that the legislature was doing its job.").

Congress's policy choice resulted in subsection 230. As the majority acknowledges, federal law preempts state law when the state law "would 'stand 'as an obstacle to the accomplishment of the full purposes and objectives of Congress' in passing § 230 of the CDA." *Zeran v. Am. Online, Inc.*, 958 F. Supp. 1124, 1134

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

(E.D. Va. 1997) (quoting *English v. Gen. Elec. Co.,* 496 U.S. 72, 79, 110 S. Ct. 2270,

110 L. Ed. 2d 65 (1990)), *aff'd,* 129 F.3d 327 (4th Cir. 1997).

## III. THE CDA IMMUNIZES BACKPAGE FROM LIABILITY

With this background about subsection 230(c)(1)'s language, context, and

policy choices in mind, I turn to J.S.'s claims.

### A. The Complaint's Factual Allegations Treat Backpage as a Publisher, Not a Content Creator

The first prerequisite to subsection 230(c)(1) immunity is that the defendant

is an interactive service provider. The parties do not dispute Backpage is such an

interactive service provider. The parties are correct.[7]

The second prerequisite to CDA immunity is that the interactive service

provider (here, Backpage) is acting as a publisher or speaker. The parties do not

dispute that J.S.'s claims treat Backpage as a publisher or speaker of information

satisfying this second prerequisite to CDA immunity, also. Again, the parties are

correct: J.S. seeks to impose liability on Backpage for failing to prevent or to remove

certain advertisements. CP at 12 ("Backpage.com continues to display prostitution

ads that include minors without any meaningful safeguards or protections for the

---

[7] *See generally Roommates,* 521 F.3d at 1162 n.6; *see also M.A. v. Vill. Voice Media Holdings, LLC,* 809 F. Supp. 2d 1041, 1048 (E.D. Mo. 2011) (holding that Backpage is an interactive computer service); *Schneider v. Amazon.com, Inc.,* 108 Wn. App. 454, 460-61, 31 P.3d 37 (2001) (Internet service providers are interactive computer services).

15

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

children."). This constitutes publication. *See, e.g.*, *Barnes*, 570 F.3d at 1103 ("[R]emoving content is something publishers do, and to impose liability on the basis of such conduct necessarily involves treating the liable party as a publisher of the content it failed to remove."); *Roommates*, 521 F.3d at 1170-71 ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230."); *Chi. Lawyers' Comm. for Civil Rights under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008) (ruling that defendant was immune because "only in a capacity as publisher could [the defendant] be liable under [42 U.S.C. § 3604(c)]"); *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003) ("[D]ecisions relating to the monitoring, screening, and deletion of content" are "actions quintessentially related to a publisher's role.").

J.S. and the majority, however, argue that Backpage flunks the third prerequisite to CDA immunity because it could also be an information content provider. As discussed above, J.S. argues,

> Backpage engages in three distinct activities, each of which independently excludes CDA immunity. First, Backpage creates, at least some, unlawful content with respect to advertising the minor Plaintiffs for sex. Second, Backpage develops unlawful content by making online sex advertisements of the minor Plaintiffs usable and available. Third, Backpage encourages unlawful content, including postings offering the minor Plaintiffs for sex.

CP at 89. Similarly, the majority holds, "Backpage's advertisement posting rules were not simply neutral policies prohibiting or limiting certain content but were

16

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

instead 'specifically designed . . . so that pimps can continue to use Backpage.com to traffic in sex.'" Majority at 8 (quoting CP at 12).

Because we are reviewing a CR 12(b)(6) motion, the assertion that Backpage constitutes a "content provider" must stand or fall on J.S.'s factual allegations, not on these legal arguments.

First, J.S. alleges, "The Backpage.com defendants were well aware that their website was being used in this way because they developed and required content to ensure that young girls, like the Plaintiffs, would continue to be advertised in this manner." CP at 2. The allegation about "required content" or content rules is not a basis for liability, as discussed below, at Part B. The allegation about awareness of illegal content is irrelevant, as discussed below, at Part D. And the allegation about the meaning of "develop" is a legal conclusion, not a factual allegation. We do not consider such legal conclusions. *Haberman*, 109 Wn.2d at 120.

J.S. also alleges that Backpage "owns, operates, designs and controls the website Backpage.com, including its content," CP at 3, and that "Backpage.com develops the content of the prostitution advertisements on its website through the use of the foregoing content requirements." CP at 10. This is a claim that equates content rules with content development. This is a legal assertion, and, as discussed below in Part B, it is one that Congress rejected when it enacted the CDA.

17

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

The complaint further alleges, "[Backpage's] content requirements are specifically designed to control the nature and context of those advertisements so that pimps can continue to use Backpage.com to traffic in sex, including the trafficking of children, and so Backpage.com can continue to profit from those advertisements." CP at 12. Once again, "content requirements"—even content requirements that promote sex trafficking—do not constitute content development under the CDA.

The complaint similarly alleges, "Backpage.com does not impose [a licensing] requirement for its website because it believes it is immune from liability, regardless of its substantial role in creating the content and context of the advertisements on its website." CP at 13. The allegation of "creating the content," as J.S. presents it here, is a legal conclusion.

Addressing the specific advertisements at issue, J.S. alleges, "As a result of Backpage.com's relationship and agreement with [alleged pimp] Hopson, J.S. engaged in sexual activities with adults, including sexual intercourse with multiple adult customers per day for several months." CP at 17. J.S. also alleges that pimps "dressed S.L. in lingerie and took photographs of her to create advertisements for the Backpage.com escort website. . . . The wordings of the advertisements were sexually suggestive and obvious invitations for commercial sex acts with the underage S.L., and from the appearance of her photographs it was obvious S.L. was

18

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

underage." CP at 17-18. J.S. further alleges, "The wordings of the advertisements were sexually suggestive and obvious invitations for commercial sex acts with the underage L.C. and from the appearance of her photographs it was obvious L.C. was underage. The advertisements were for prostitution services and included contact information that allowed customers to access L.C." CP at 20. These allegations, while repulsive, do not demonstrate that Backpage created the content of these advertisements and hence do not form a basis for rejecting the application of CDA immunity here.

I fear that the majority has accepted J.S.'s legal conclusions while failing to recognize the lack of supporting facts. But when we depart from J.S.'s legal argument and look only at factual allegations—as we must when reviewing a CR 12(b)(6) motion—we find allegations that pimps wrote and uploaded illegal content and that Backpage intentionally published it, knowing that it would lead to child sex trafficking. As discussed in the sections below, Congress has said that that is not content development, but publication.

> B.  Under the CDA's Definitions, Backpage Did Not "Develop Content" by Maintaining Neutral Content Requirements

J.S. argues that Backpage "developed" content by maintaining content requirements for advertisements posted on its website:

> [T]he backpage defendants "developed" the content of the escort advertisements themselves by providing phoney "posting rules" and

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

> "content requirements" to instruct sex traffickers not to use certain words and graphics in order to avoid growing scrutiny by the public and law enforcement, all with the goal of allowing the backpage defendants to continue profiting from their illegal marketplace for sex.

Br. of Resp'ts at 21.

This allegation—that Backpage designed its posting rules to induce sex trafficking—might prove true. Indeed, we presume it is true when evaluating the sufficiency of J.S.'s complaint. But adopting such posting rules still does not make Backpage a "content provider" within the meaning of the CDA, even under the Ninth Circuit case upon which J.S., the majority, and the concurrence place principal reliance. Majority at 7-8; concurrence at 12-13. In that case, *Roommates*, the court held, "[A] website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct." 521 F.3d at 1168.[8]

In fact, courts have consistently rejected the contention that defendants "develop" content by maintaining neutral policies prohibiting or limiting certain

---

[8] J.S. asserts that the court in *Roommates* "approved of several definitions of the term 'develop' and several methods by which a provider can become a 'developer," including making "'usable or available'" and by "'researching, writing, gathering, organizing and editing information for publication on websites.'" Br. of Resp'ts at 17-18 (quoting *Roommates*, 421 F.3d at 1168-69). J.S. misreads this case. The court in *Roommates* stated, "[T]o read the term so broadly would defeat the purposes of section 230 by swallowing up every bit of the immunity that the section otherwise provides." *Roommates*, 521 F.3d at 1167. And contrary to J.S.'s assertion, Br. of Resp'ts at 19, the Tenth Circuit in *Fed. Trade Comm'n v. Accusearch Inc.*, 570 F.3d 1187, 1200 (10th Cir. 2009), applied the Ninth Circuit's definition stated in *Roommates*.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

content. For example, in *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 969 (N.D. Ill. 2009), which the majority cites at 7, the plaintiff claimed that even though Craigslist, an Internet classifieds service, prohibited illegal content on its website, users frequently posted ads promising sex for money. 665 F. Supp. 2d at 962. Consequently, the plaintiff asserted that Craigslist "ma[de] it easier for prostitutes, pimps, and patrons to conduct business." *Id.* at 963. A federal court in Illinois dismissed the claims on a Fed. R. Civ. P. 12(b)(6) motion, explaining, "Plaintiff's argument that Craigslist causes or induces illegal content is further undercut by the fact that Craigslist repeatedly warns users not to post such content. While we accept as true for the purposes of this motion plaintiff's allegation that users routinely flout Craigslist's guidelines, it is not because Craigslist has caused them to do so. Or if it has, it is only 'in the sense that no one could post [unlawful content] if craigslist did not offer a forum.'" *Id.* at 969 (quoting *Chi. Lawyers'*, 519 F.3d at 671); *see also Chi. Lawyers'*, 519 F.3d at 671 ("Nothing in the service craigslist offers induces anyone to post any particular listing."); *Roommates*, 521 F.3d at 1171 ("To be sure, the website provided neutral tools, which the anonymous dastard used to publish the libel, but the website did absolutely nothing to encourage the posting of defamatory content—indeed, the defamatory posting was contrary to the website's express policies." (citing *Carafano*, 339 F.3d at 1124)); *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1198 (N.D. Cal. 2009) (rejecting plaintiff's claim relating to third-

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

party ads where the ads were "'contrary to [Google's] express polic[y]'" (alterations

in original) (quoting *Roommates*, 521 F.3d at 1171).

The facts in *Dart* are analogous to the facts here. J.S. alleges that pimps—not

Backpage—created and uploaded the ads at issue. CP at 2 ("adult pimps . . . posted

advertisements for the girls"), 17 ("adult pimps . . . create[d] . . . and then uploaded

[the] advertisements of S.L. onto . . . Backpage.com"). Nothing in Backpage's

policies obligated users to flout Backpage's express content requirements or to post

unlawful content. J.S.'s allegations indicate that the pimps chose the content

ultimately used in the advertisements. CP at 2, 12, 16, 17-18, 20-21. The actual

"information" at issue consisted of the particular wording and photos that the pimps

provided. CP at 16-21.

Thus, holding Backpage liable would punish it for publishing third party

content, and the CDA prohibits such liability. *See also Jane Doe v. MySpace, Inc.*,

528 F.3d 413, 420 (5th Cir. 2008) (dismissing claims brought on behalf of a minor

sexually assaulted after meeting a man through the defendant's website:

"[Plaintiffs'] claims are barred by [section 230], notwithstanding their assertion that

they only seek to hold MySpace liable for its failure to implement measures that

would have prevented [the abuse]. Their allegations are merely another way of

claiming that MySpace was liable for . . . third-party-generated content."); *Julie Doe*

*v. MySpace Inc.*, 175 Cal. App. 4th 561, 573, 96 Cal. Rptr. 3d 148 (2009)

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

("[Plaintiffs] want MySpace to ensure that sexual predators do not gain access to (i.e., communicate with) minors on its Web site. That type of activity—to restrict or make available certain material—is expressly covered by section 230."); *John Doe v. SexSearch.com*, 502 F. Supp. 2d 719, 727-28 (N.D. Ohio 2007) ("At the end of the day . . . Plaintiff is seeking to hold SexSearch liable for its publication of third-party content and harms flowing from the dissemination of that content. . . . Section 230 specifically proscribes liability in such circumstances."), *aff'd on other grounds*, 551 F.3d 412 (6th Cir. 2008).

J.S. and the majority then rely on *Roommates*, 521 F.3d at 1168, to suggest that Backpage lost immunity because it "'contribute[d] materially to the illegality of the alleged conduct.'" Majority at 8.

They misread *Roommates*. In *Roommates*, the Ninth Circuit did hold that Roommates.com was an information content provider and was not entitled to immunity from liability for violating housing discrimination laws under the CDA. 521 F.3d at 1164. But as a condition for using its website, which is designed to help individuals find suitable roommates, Roommates.com *required* users to create a profile describing the user's desired roommate and *mandated* that users "disclose his sex, sexual orientation and whether he would bring children to a household." *Id.* at 1161. Notably, the website also encouraged users to provide separate comments "in an open-ended essay" describing themselves and their desired roommate. *Id.* The

23

*J.S., S.L., and L.C. v. Village Voice Media Holdings et al.*, No. 90510-0
(Gordon McCloud, J., Dissent)

Ninth Circuit ruled that while the website's users were "information content providers" because they ultimately provided the information for their profiles, this "does not preclude Roommate[s.com] from *also* being an information content provider by helping 'develop' at least 'in part' the information in the [mandatory dropdown menu] profiles" through its required questionnaire. *Id.* at 1165. The Ninth Circuit therefore concluded that Roommates.com lacked immunity for the discriminatory content that it mandated users provide with that drop-down menu and required discriminatory fields:

> Roommate[s.com] does not merely provide a framework that could be utilized for proper or improper purposes; rather, Roommate[s.com]'s work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism is directly related to the alleged illegality of the site. . . Roommate[s.com] is directly involved with developing and enforcing a system that subjects subscribers to allegedly discriminatory housing practices.

*Id.* at 1172.

Critically, however, *Roommates* also held that the defendant was immune from liability for the open-ended comments users posted, which the website neither required nor shaped through its questionnaire:

> Roommate[s.com] publishes these comments as written. It does not provide any specific guidance as to what the essay should contain, nor does it urge subscribers to input discriminatory preferences. Roommate[s.com] is not responsible, in whole or in part, for the development of this content, which comes entirely from subscribers and is passively displayed by Roommate[s.com]. Without reviewing every essay, Roommate[s.com] would have no way to distinguish unlawful

24

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

discriminatory preferences from perfectly legitimate statements. Nor can there be any doubt that this information was tendered to Roommate[s.com] for publication online.

*Id.* at 1173-74.

Thus, the defendant in *Roommates* was immune from liability for claims based on nonmandatory content even if this content showed roommate selection on a discriminatory basis. But it was not immune for alleged violations of housing discrimination laws based on the comments that Roommates.com elicited with mandatory illegal questions about race, sex, or sexual preferences.

Here, J.S. alleges that Backpage maintains policies prohibiting solicitation for illegal services "exchanging sexual favors for money or other valuable consideration," prohibiting material that exploits minors, and prohibiting material that "in any way constitutes or assists in human trafficking." CP at 9-10. J.S. also acknowledges—and even alleges—that Backpage prohibits the use of sexually explicit language; naked images; images using transparent clothing, graphic box, or pixelization to cover bare breasts or genitalia; certain code words; suggesting an exchange of sex acts for money; and advertising an illegal service. CP at 8. If users post advertisements that do not comply with these guidelines, it is not because Backpage caused them to do so with mandatory questions or in any other way. Thus, contrary to the majority's and the concurrence's arguments, majority at 8; concurrence at 11-12, unlike the website in *Roommates*, Backpage does not tell users

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

that they should or must include certain information as a condition of using the website. And J.S. does not allege that Backpage induces users to post particular advertisements or express a preference for soliciting minors for sex. *See Chi. Lawyers'*, 519 F.3d at 671-72. Backpage instead "provide[s] a framework that could be utilized for proper or improper purposes." *Roommates*, 521 F.3d at 1172.

Based on these factual allegations, Backpage's rules did not cause or induce anyone to create, post, or search for illegal content. *See Dart*, 665 F. Supp. 2d at 969. Therefore, even under *Roommates*, J.S. fails to allege facts that would establish Backpage created content through its posting requirements.

### C. Under the CDA, There Is No For-Profit Exemption

J.S. also claims that CDA immunity does not apply because Backpage derives the "vast majority" of its income "from sex trafficking." Br. of Resp'ts at 24. Backpage allegedly "provid[es] commissions to pimps who refer other pimp customers," "accepts pre-paid credit card payments for the advertisements of more than one girl from the same source," and "charge[s] their users a higher fee to post in their 'escort' section than they do for any other section on their website." *Id.*

But under the CDA, "'[t]he fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider "creates" or "develops" that content.'" *M.A. v. Vill. Voice Media Holdings, LLC*, 809 F. Supp. 2d 1041, 1050 (E.D. Mo 2011) (alteration in original) (quoting *Goddard v.*

26

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Google, Inc.*, No. C 08-2738JF(PVT), 2008 WL 5245490, at *3 (N.D. Cal. Dec. 17, 2008) (court order)). Barring subsection 230(c) immunity because Backpage structured its website to increase its profits "would be to create a for-profit exception to § 230's broad grant of immunity. This the Court may not do." *Id.*

Based on the allegations in this complaint, Backpage did not materially contribute to the development or creation of the content at issue no matter how much it benefited financially from the pimps' use of its website.

> D. Under the CDA, Backpage's Escort Category Does Not Defeat Immunity

J.S. also claims that Backpage contributes materially to the unlawful content of the advertisements on its website because "Backpage chose the term 'escorts' as its heading because it means 'prostitutes' in the world of sex trafficking, and thus would most effectively identify the internet location of illicit sex ads to johns." Br. of Resp'ts at 30. J.S. asserts that Backpage placed its own logo and the word "escort" on the individual ads in the "escort" section. *Id.*[9] J.S. further argues that Backpage "encourages illegal content" because "selling sex online is backpage's business

---

[9] Backpage contends that the website automatically generates the labels on the ads identifying the category in which the ad appears. Appellants' Reply Br. at 18 n.15. Other courts have rejected similar claims that this defeats CDA immunity. *See Seldon v. Magedson*, No. CV-13-00072-PHX-DGC, 2014 WL 1456316, at *4, *6 (D. Ariz. Apr. 15, 2014) (court order) ("software that automatically published and filed a third-party's statements "as" "philip-seldon | Ripoff Report | Complaints Reviews Scams Lawsuits Frauds Reported" "does not undercut Xcentric's claim to immunity under the CDA").

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

model" and because its website contains an "'escorts'" section. *Id.* at 25, 27-28. J.S. continues that Backpage's "knowledge about the illicit ads in its 'escorts' section shows that it is well aware that the services offered on its website are (1) illegal and (2) not the same as any of the *lawful* services regulated by state or municipal law." *Id.* at 28.

J.S. cites *First Global Communications, Inc., v. Bond*, 413 F. Supp. 2d 1150, 1152 (W.D. Wash. 2006), and states that the case "recognize[ed] 'escort was a euphemism for prostitution services.'" Br. of Resp'ts at 28. This is incorrect. In fact, *Bond* involved websites that admittedly provided information about prostitution services in the United States and abroad. 413 F. Supp. 2d at 1151-52. The court made no findings about the term "escort" and did not seek to define this term. Rather, in describing the website, the court noted, "Plaintiff's counsel acknowledged at oral argument that 'escort services' is essentially a euphemism for prostitution services." *Id.* at 1152. Therefore, we reject J.S.'s argument. *See also City of Yakima v. Emmons*, 25 Wn. App. 798, 802, 609 P.2d 973 (1980) (recognizing the existence of "legitimate escort service[s]").

Even if "escort" were a euphemism for "prostitute," subsection 230(c) would still provide immunity. In *M.A.*, 809 F. Supp. 2d at 1049, the court stated, "[T]he creation by Backpage of an 'adult' category does not impose liability on Backpage for ads posted in that category." The court in *M.A.* cited *Dart* in rejecting the

28

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

plaintiff's claim that Backpage lacked immunity because it created an "escort" category: "'Craigslist created the categories, but its users create the contents of the ads and select which categories their ads will appear in.'" *Id.* (quoting *Dart*, 665 F. Supp. at 962).[10]

Similarly, in *Prickett v. InfoUSA, Inc.*, 561 F. Supp. 2d 646, 651 (E.D. Tex. 2006), the court rejected plaintiffs' argument "that because the anonymous third party was prompted to select subcategories through the Defendant's database gathering system, the Defendant directed the third party's selections. The fact that some of the content was formulated in response to the Defendant's prompts does not alter the Defendant's status [as a publisher]." *Roommates* similarly held that by

---

[10] J.S. contends that *M.A.* is distinguishable because "while *M.A.* involved similar facts (i.e. a minor trafficked on backpage.com), it was pled much differently than the child victims' case and the Missouri court was thereby limited in its analysis." Br. of Resp'ts at 32-33. Specifically, J.S. argues that *M.A.* involved no allegations that Backpage was responsible for developing the ad content at issue or for encouraging the development of the content's offensive nature and that the court "mistakenly seemed to regard backpage.com as an innocent classified ads website, instead of a deliberate purveyor of prostitution." *Id.* at 33.

J.S. is partially correct. The *M.A.* plaintiff alleged that Backpage "'[w]as responsible in part for the development and/or creation of information provided through the internet or other internet computer service,'" *M.A.*, 809 F. Supp. 2d at 1044 (alteration in original), but also stated later that she was not suing Backpage for the ad content. *Id.* at 1046. In this case, in contrast, J.S. is suing Backpage for the ad content. But J.S.'s *arguments* still conflict with the *allegations* that pimps, not Backpage, uploaded advertisements with sexually suggestive wording and photographs. CP at 16, 17, 20. And the complaint here still alleges no facts showing that Backpage actually selected the wording or photos that the ads at issue contained.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

creating a neutral category "escort," a legal service in Washington, Backpage provided a tool but that the pimps were the ones who used it to develop the unlawful content. 521 F.3d at 1172. Accordingly, the creation of this category does not establish that Backpage contributed materially to unlawful content of the ads (within the meaning of the CDA).

In fact, other federal courts have held that the First Amendment to the United States Constitution protects escort ads and that the CDA preempts state measures imposing liability for publishing escort ads. In *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1268 (W.D. Wash. 2012), for example, the court struck down as unconstitutionally vague a Washington statute that targeted Backpage by creating a criminal offense for "'advertising commercial sexual abuse of a minor.'" (Quoting S.B. 6251, at 2, 62d Leg., Reg. Sess. (Wash. 2012).)[11] The court found it "unlikely that Defendants would be able to prove that *all* online advertisements for escort services are ads for prostitution." *Id.* at 1282. The court expressed concern that "a website that contains a section for postings for escort services that chooses to either shut down that section or require age verification will likely chill protected speech

---

[11] The court in *McKenna* stated, "Washington legislators have openly stated that the challenged statute is aimed at Backpage.com and that they seek to eliminate escort ads and similar Internet postings." *McKenna*, 881 F. Supp. 2d at 1270.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

in the course of doing so." *Id.*;[12] *see also Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 823 (M.D. Tenn. 2013) (CDA preempted a Tennessee statute similar to Washington's, which "impose[d] liability on websites such as Backpage.com for selling or offering to sell advertisements, activity inherent in their role as publishers."); *Dart*, 665 F. Supp. 2d at 968 ("Plaintiff is simply wrong when he insists that [the 'erotic services' category and subcategories] are all synonyms for illegal sexual services."). These cases demonstrate that a category for escort services on Backpage's website is another neutral, legal tool that users misuse to commit unlawful acts. Therefore, J.S. cannot use this as a basis to defeat immunity.

E.    Under the CDA, Backpage's Alleged Knowledge Does Not Defeat Immunity

We are thus left with J.S.'s theory that Backpage is liable for knowingly encouraging unlawful content promoting sex trafficking of children. But courts have consistently held that an allegation that a defendant encourages unlawful content is insufficient to defeat CDA immunity. *See, e.g., Hill v. StubHub, Inc.*, 219 N.C. App. 227, 727 S.E.2d 550, 560 (2012) ("the fact that a website acted in such a manner as to encourage the publication of unlawful material does not preclude a finding of

---

[12] The court in *McKenna* also reasoned that "numerous states license, tax and otherwise regulate escort services as legitimate businesses." *Id.* at 1282. *See, e.g.*, RCW 82.04.050(3)(g) (escort services subject to state business and occupation tax); *see also* Appellants' Opening Br. at 30-31 n.13 (listing state and municipal provisions recognizing and regulating escort services).

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

immunity pursuant to [section] 230"); *Ascentive, LLC v. Opinion Corp.*, 842 F. Supp. 2d 450, 476 (E.D.N.Y. 2011) ("[T]here is simply 'no authority for the proposition that [encouraging the publication of defamatory content] makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site." (second alteration in original) (quoting *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) (holding that the ripoffreport.com website was not an information content provider even though it allegedly encouraged defamatory reviews by others for its financial benefit)).

As the First Circuit explained, "It is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420. "Section 230 immunity applies even after notice of the potentially unlawful nature of the third-party content." *Id.*; *see also Zeran*, 129 F.3d at 333 ("[I]f computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement—from any party, concerning any message," and such notice-based liability "would deter service providers from regulating the dissemination of offensive material over their own services" by confronting them with "ceaseless choices of suppressing controversial speech or sustaining prohibitive liability," which is contrary to section 230's statutory purposes). Thus, despite Backpage's alleged knowledge that its users post illegal content, its "'failure to

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

intervene is immunized.'" *M.A.*, 809 F. Supp. 2d at 1051 (quoting *Goddard*, 2008 WL 5245490, at *3).

To be sure, intentionally promoting child sex trafficking is a serious crime in our state. But encouraging users to use a website—even with the intent to promote sex trafficking of minors—does not convert a defendant into a "content provider" within the meaning of the CDA.

F.    Subsection 230(c)(1) Contains No Good Faith Requirement

J.S. further claims that Backpage lacks immunity because "backpage's 'posting rules' and 'content requirements' are not developed or enforced in a *good faith* effort to restrict offensive content, but rather in a surreptitious effort to evade law enforcement, skirt legal liability, and maintain the profitability of its escort website." Br. of Resp'ts at 31. The concurrence echoes this argument. Concurrence at 5, 9 n.4. J.S. and the concurrence cite 47 U.S.C. § 230(c)(2), which contains a good faith prerequisite to subsection 230(c)(2) immunity, to support this position.

But Backpage moved to dismiss based on subsection 230(c)(1), a provision separate from subsection 230(c)(2). Subsection 230(c)(1) contains no intent-based exception to the immunity that it provides. *See Levitt v. Yelp! Inc.*, No. C-10-1321-EMC, 2011 WL 5079526, at *7 (N.D. Cal. Oct. 26, 2011) (court order) ("[subsection 230](c)(1)'s immunity applies regardless of whether the publisher acts in good faith"), *aff'd*, 765 F.3d 1123 (9th Cir. 2014); *see also Barnes*, 570 F.3d at 1105

33

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

("Subsection [230](c)(1), by itself, shields from liability all publication decisions, whether to edit, to remove, or to post, with respect to content generated entirely by third parties. Subsection [230](c)(2), for its part, provides an additional shield from liability . . . not merely [for] those whom subsection [subsection](c)(1) already protects, but [for] *any* provider of an interactive computer service.").

For that reason, courts have found that defendants are immune under subsection 230(c)(1) even if they act in bad faith. *See, e.g., Zeran,* 129 F.3d at 331-33 (interactive service provider immune from defamation liability even when it has actual knowledge of statement's falsity); *Asia Econ. Inst. v. Xcentric Ventures LLC,* No. CV 10–01360 SVW (PJWx), 2011 WL 2469822, at *6 (C.D. Cal. May 4, 2011) (court order) (holding that defendant's deliberate manipulation of HTML (hypertext markup language) computer code for paying customers to make certain reviews more visible in online search results was immune under section 230 and that "[a]bsent a changing of the disputed reports' substantive content that is visible to consumers, liability cannot be found."); *Blumenthal,* 992 F. Supp. at 52.

The concurrence seeks to avoid this conclusion by arguing that subsection 230(c)(2) basically eviscerates subsection 230(c)(1). It does this by arguing that subsection 230(c)(2) provides the defendant with the defense, while subsection 230(c)(1) essentially provides the defendant with nothing. Concurrence at 5-6. But we cannot ignore the plain language of a federal statute, or treat it as a superfluous,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

any more than we can do that with a state statute. As the Seventh Circuit ruled, in rejecting the same argument, "[S]ubsection [230](c)(2) does not deal with the liability of speakers and publishers, the subject of subsection [230](c)(1). We read each to do exactly what it says." *Chi. Lawyers'*, 519 F.3d at 671 (affirming grant of summary judgment).

### G. The Cases That J.S. Cites Do Not Support Their Legal Arguments

J.S. compares this case to *Anthony v. Yahoo!, Inc.*, 421 F. Supp. 2d 1257 (N.D. Cal. 2006), *NPS LLC v. StubHub, Inc.*, No. 06-4874-BLS1, 2009 WL 995483, at *1 (Mass. Super. Ct. Jan. 26, 2009) (court order), *Jones v. Dirty World Ent'mt Recordings, LLC*, 965 F. Supp. 2d 818 (E.D. Kent. 2013) (*Jones* II), *rev'd and vacated*, *Jones* III, 755 F.3d 398, and *Jane Doe v. Internet Brands, Inc.*, 767 F.3d 894 (9th Cir. 2014). Br. of Resp'ts at 32-37; Resp'ts Notice of Suppl. Auth. Ex. A.

In *Anthony*, the court rejected Yahoo's claim of immunity from liability where the plaintiff alleged that Yahoo created false dating profiles posted on its website and sent them to users "for the purpose of luring them into renewing their subscriptions." 421 F. Supp. 2d at 1262. The court held that Yahoo was a content provider and was not immune from tort liability because it *created* the false profiles. *Id.* at 1263. But in contrast to the plaintiff in *Anthony*, J.S. does not allege that

35

Backpage actually chose the content of the ads or otherwise created the actual challenged content. Thus, J.S. cannot rely on this case.

In *NPS*, a Massachusetts state trial court applied the CDA and denied a website operator's motion for summary judgment with respect to a claim by a football team and stadium owner of intentional interference with the team's advantageous relationship with its season tickets holders. *NPS*, 2009 WL 995483, at \*4. The court ruled that evidence in the record showed that the website materially contributed to its sellers' illegal "'ticket scalping'" and, thus, CDA immunity did not apply. *Id.* at \*13. Specifically, the website's pricing structure meant that it profited from violations of antiscalping laws; the website did not require a seller to disclose the face value of a ticket, so a buyer was unaware of whether the ticket price was above the legal threshold; and the website "affirmatively encouraged" "underpriced ticket[]" sales by waiving its fees for a certain class of sellers. *Id.* at \*11. The court said that the absence of information about the face value of a ticket precluded a buyer from knowing if a ticket price was above the price threshold set by law and prevented any policing of the website to prohibit scalping. *Id.*

Arguably, Backpage similarly engaged in willful blindness and maintained a pricing structure that encouraged pimps to misuse its website. But *NPS* conflicts with the cases discussed above that rejected similar arguments about a website's notice of the illegal content and its pricing structure. Notably, later cases have

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

rejected *NPS*. *See, e.g., Milgram v. Orbitz Worldwide, Inc.*, 419 N.J. Super. 305, 16 A.3d 1113, 1126 (2010) (finding online ticket marketplace immune; dismissing *NPS* as inconsistent with other cases, and noting that it was "quite frankly, unclear . . . which facts the court used in reaching the conclusion that § 230 did not apply"); *Hill*, 727 S.E.2d at 563 ("declin[ing] to follow" *NPS* as "inconsistent with the decisions concluding that knowledge of unlawful content does not strip a website of [section 230] immunity"). Although it is arguable that Backpage, like StubHub, contributed to the illegality here, *NPS* is an outlier.

*Internet Brands* does not support J.S.'s claims, either. In *Internet Brands*, the Ninth Circuit held that the CDA did not apply to a model's claim against the operator of a social networking site for models for its negligent failure to warn that rapists were using the website to lure models to fake auditions where they would be drugged and sexually assaulted. 767 F.3d at 895. The court determined that the model's claim did not seek to hold the defendant liable for its failure to remove content that others created; rather, the claim sought to hold the defendant liable for its own failure to provide information that it allegedly possessed about the rapists. *Id.* at 897. The court explained, "Any obligation to warn could have been satisfied without changes to the content posted by the website's users. Internet Brands would simply have been required to give a warning to Model Mayhem users, perhaps by posting a notice on the website or by informing users by e-mail" the information it had about the

37

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

rapists' activities. *Id.* Because the plaintiff allegedly failed to generate its own warning to users, CDA immunity did not apply. *Id.* at 898. Here, J.S. alleges no similar failure to warn claim. J.S. seeks to hold Backpage liable as a publisher of content that third parties created.

Finally, J.S. cites to *Jones*. In *Jones*, users could anonymously upload comments, photographs, and videos to a website called "www.TheDirty.com," which the website's operator would select and publish along with his own editorial comments. *Jones v. Dirty World Entm't Recordings, LLC*, 840 F. Supp. 2d 1008, 1009 (E.D. Ky. 2012) (*Jones* I). After the plaintiff became the unwelcome subject of several posts, the district court denied immunity from her state tort claims. *Jones* II, 965 F. Supp. 2d at 823. The court found that the defendant "invited and encouraged" the postings through its name and by inciting the site's viewers to form "'the Dirty Army,' which [the defendant] urged to have 'a war mentality' against anyone who dared to object to having their character assassinated." *Id.* at 822-23. The defendant's comments about the plaintiff added to the posts at issue "effectively ratified and adopted the defamatory third-party post." *Id.* at 823.

After J.S. filed its brief, however, the Sixth Circuit reversed. *Jones* III, 755 F.3d at 402. Applying the material contribution test defined in *Roommates* and rejecting the district court's "encouragement" test, the Sixth Circuit held,

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Dirty World and Richie did not author the statements at issue; however, they did select the statements for publication. But Richie and Dirty World cannot be found to have materially contributed to the defamatory content of the statements posted on October 27 and December 7, 2009, simply because those posts were selected for publication. Nor can they be found to have materially contributed to the defamatory content through the decision not to remove the posts.

. . . .

Unlike in *Roommates*, the website that Richie operated did not require users to post illegal or actionable content as a condition of use. Nor does the name of the website, www.TheDirty.com, suggest that only illegal or actionable content will be published. Unlike in [*Federal Trade Commission v.* ]*Accusearch*[ *Inc.*, 570 F.3d 1187 (10th Cir. 2009)], Richie or Dirty World did not compensate users for the submission of unlawful content. The website's content submission form simply instructs users to "[t]ell us what's happening. Remember to tell us who, what, when, where, why." The form additionally provides labels by which to categorize the submission. These tools, neutral (both in orientation and design) as to what third parties submit, do not constitute a material contribution to any defamatory speech that is uploaded.

*Id.* at 415-16 (fourth alteration in original).

IV.  NO RELEVANT DIFFERENCE EXISTS BETWEEN STATE AND FEDERAL PLEADING STANDARDS HERE

Backpage also claims that the trial court applied CR 12(b)(6) improperly because it "went beyond just accepting Plaintiffs' factual allegations" and credited J.S.'s legal contentions that Backpage could be held liable for "'assist[ing] in developing' content." Appellants' Opening Br. at 43. Backpage also alleges, "To the extent the Superior Court felt constrained to reject federal case law because of

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

Washington's more lenient CR 12(b)(6) pleading standards, it erred for the separate reason that state procedural rules cannot trump federal substantive rights." *Id.* at 44.

While I agree that it appears the trial court's order erroneously credited J.S.'s legal conclusions, rather than just J.S.'s factual allegations, federal and state law do not differ about crediting legal conclusions in a plaintiff's complaint on a CR or Fed. R. Civ. P. 12(b)(6) motion. *Haberman*, 109 Wn.2d at 120 ("[t]he court need not accept legal conclusions as correct"); *Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Washington's more relaxed pleading standards did not play any role in this case.

CONCLUSION

This case does not ask us to decide whether pimps should be able to traffick our children without consequence. The answer to that question is certainly no. And this case does not ask us to decide whether third party accomplices or coconspirators should be able to escape criminal prosecution for human trafficking and child rape. The answer to that is also a resounding no. Instead, the question before us is whether the CDA, a federal statute, shields this defendant from this state law claim. Using settled principles of statutory interpretation, the CDA compels me to conclude that the answer to that question is also no. J.S. fails to allege facts sufficient to prove that Backpage was a content provider as opposed to a service provider. Thus,

For the current opinion go to https://www.lexisnexis.com/clients/wareports/.

subsection 230(c) immunizes Backpage from liability for J.S.'s claims. And subsection 230(c) trumps conflicting state law.

I would therefore reverse the trial court's denial of Backpage's CR 12(b)(6) motion to dismiss. I respectfully dissent.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*J.S., S.L., and L.C. v. Village Voice Media Holdings et al.*, No. 90510-0
(Gordon McCloud, J., Dissent)

Gordon McCloud, J.

Owens, J.

Fairhurst, J.