**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

| | |
|---|---|
| PIPE FITTERS LOCAL UNION 120 PENSION PLAN and SUZANNE FLANNERY, individually and on behalf of all others similarly situated, | No. 85541-7-I |
| Respondents, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| SCOTT MCFARLANE, ROSS TENNENBAUM, MARCELA MARTIN, REJEEV SINGH, BRUCE CRAWFORD, MARION FOOTE, EDWARD GILHULY, WILLIAM INGRAM, TAMI RELLER, BRIAN SHARPLES, SRINIVAS TALLAPRAGADA, and KATHLEEN ZWICKERT, | |
| Petitioners. | |

MANN, J. — This dispute arises out of a merger between Avalara, Inc. (Avalara), a Seattle based tax software company, and Vista Equity Partners Management, LLC (Vista). Avalara shareholders, Pipe Fitters Local Union 120 Pension Plan and Suzanne Flannery (Pipe Fitters), brought a class action lawsuit against individual officers and members of Avalara's board of directors (the defendants) asserting a breach of fiduciary duty. The defendants moved to dismiss the action under CR 12(b)(6), arguing that the

only relief available to the shareholders was the statutory appraisal process under the Washington Business Corporation Act (WBCA), Title 23B RCW. The trial court denied the defendants' motion to dismiss. The trial court then granted the defendants' motion to certify the following question for our review:

> Are minority shareholders who dissent to a corporate merger limited to the appraisal process set forth in RCW 23B.13.020 as the exclusive remedy for a claim for money damages, or are they entitled in cases of fraud, to file suit?

We accept discretionary review, answer the certified question, and affirm the trial court's decision denying the defendants' motion to dismiss.[1]

I

A

Avalara provides tax compliance software.[2] Scott McFarlane cofounded Avalara in 1999 and has served on the board of directors since 2004. McFarlane became chief executive officer of Avalara in 2007 and board chairman in 2014. Since going public in 2018, Avalara has sustained annual growth of 37 percent with three consecutive years of positive free cash flow. Growth and profitability were predicted to continue for years to come. Avalara appeared to be a resilient company because of a stable customer base and a reserve of $1.5 billion in cash. Acquisitions was a large part of Avalara's business growth plan, it was actively pursuing acquisitions through 2022.

---

[1] While our Commissioner's ruling granting discretionary review allowed the defendants to seek de novo review of the merits of the trial court's decision denying the motion to dismiss, we decline to extend our discretionary review beyond the question of law certified by the trial court under RAP 2.3(b)(4).

[2] Because this case comes before us based on a motion to dismiss under CR 12(b)(6), we "accept as true the allegations in a plaintiff's complaint and any reasonable inferences therein." J.S. v. Vill. Voice Media Holdings, LLC, 184 Wn.2d 95, 100, 359 P.3d 714 (2015). The facts are summarized from the shareholders' complaint.

Ross Tennenbaum joined Avalara as chief financial officer in 2019. Before joining Avalara, Tennenbaum was a managing director at Goldman Sachs & Co. LLC (Goldman Sachs). McFarlane and Tennenbaum retained Goldman Sachs to serve as Avalara's financial advisor. Potential conflicts of interest were not disclosed to the Avalara board of directors[3] at that time even though Goldman Sachs had transacted in Avalara securities via "capped call transactions." The board approved the hiring of Goldman Sachs without a meeting.

Goldman Sachs provided Avalara with a financial analysis containing a range of expected "takeout prices" of $90 to $130 per share, with a midpoint at $110 per share. McFarlane and Tennenbaum provided Goldman Sachs incentive to sell the company, including a transaction fee of .77 percent of the aggregate consideration paid in an acquisition and a $5 million fee upon the signing of a merger agreement. The incentive was not approved by the board.

At the January 2022 board meeting, management reported a 40 percent growth in annual revenue for 2021. At the April 2022 board meeting, first quarter reports were positive and the board received a long-term financial plan that assumed 27 percent annual growth in 2025 and $300 million in annual cash flow by 2025. Management approved, endorsed, and presented an "Accelerated Case" financial plan prepared by Goldman Sachs that assumed 31 percent annual growth and $339 million in annual free

---

[3] The Avalara board of directors (board) included defendants McFarlane and Tennenbaum, along with Marcela Martin, Rajeev Singh, Bruce Crawford, Marion Foote, Edward Gilhuly, William, Ingram, Tami Reller, Brian Sharples, Srinivas Tallapragada, and Kathleen Zwickhert.

cash flow by 2025. Based on that plan, Goldman Sachs presented a discounted cash flow valuation of Avalara of $116 per share.[4]

By late April 2022, Avalara's strong performance attracted the interest of leveraged buyout firms and other potential strategic partners. At the April 27, 2022 board meeting, Goldman Sachs presented on what a sale of Avalara might look like. The presentation anticipated takeout offer prices at $110 to $150 per share with a mid-point of anticipated offer prices at $138 per share. Goldman Sachs identified six "Tier 1" private equity firms as potential buyers, including Vista, a Goldman Sachs client. Vista was cofounded by former Goldman Sachs bankers and has invested in multiple business deals with Goldman Sachs. In the same presentation, Goldman Sachs reported that leveraged buyout firms would likely retain management after a sale. Goldman Sachs presented procedural safeguards to be considered if the company went private such as appointing a special committee to oversee any negotiations.

Two board directors, Rajeev Singh and Marcela Martin, were associated with Vista. Singh held limited partnership interests in multiple Vista funds, one of which was a party to the impending sale process. Martin occupied a seat on the board of directors of a corporation which was majority owned by Vista.

At the end of the April 27 meeting, the board initiated the sale process. But the board did not appoint a special committee, and instead authorized management—including McFarlane and Tennenbaum—to supervise the sale. Management was authorized to meet with potential buyers and only "periodically report back to the Board."

---

[4] Discounted cash flow (DCF) is a valuation method that estimates the value of an investment using its expected future cash flows.

This allowed McFarlane and Tennenbaum to narrow the sale process by not contacting any potential strategic buyers who were less likely to retain Avalara management post sale. The board did not hire a second financial advisor.

Notably, the board decided to sell during a time when leveraged buyout valuations were plagued by high interest rates. Goldman Sachs warned that the high interest rates had a significant negative effect on Avalara's valuation. The poor timing of the sale was used by McFarlane and Tennenbaum to provide material advantages to a particular buyer—Vista—to the exclusion of other bidders.

During the sale process, Avalara required bidders to sign confidentiality agreements prohibiting the bidder from contacting financing sources without first getting Avalara's approval. Multiple potential buyers, including Vista, sought Avalara's approval. McFarlane and Tennenbaum gave Vista approval to contact three financing sources while the other potential buyers were denied. Subsequently, three potential buyers dropped out of the process. During this time, McFarlane and Tennenbaum met with Vista on multiple occasions, including three private dinners. McFarlane also told analysts in late June that he had "confidence in sustaining growth and becoming a multibillion-dollar company."

At the deadline for initial bids in the sale, only two possible buyers remained, Vista and Thoma Bravo. Thoma Bravo submitted a bid at $90 to $95 per share and provided no indication it intended to keep Avalara management. Vista submitted its initial bid to McFarlane on June 23, 2022, at $97 to $101 per share.[5] Vista stated it was

---

[5] Goldman Sachs calculated the price target, a projection of a security's future price, of $136 per share on June 24, 2022.

"confident in [its] ability to secure fully committed equity financing to support the transaction." The offer terms also addressed the existing management:

> 3. Management. Vista seeks to invest in and partner with superior management teams, offering them strategic and financial support as appropriate. Through equity participation programs and other incentive structures, we seek to align management's incentives with our own. We have been thoroughly impressed by the high caliber of Avalara's executive team that we have met to date, and we look forward to meeting the broader team.

During a June 24, 2022, special meeting, McFarlane notified the board of some of Goldman Sachs's conflicts of interest related to Vista and Thoma Bravo. But McFarlane failed to present a full picture of compensation received from Vista and the close financial ties between Vista executives and Goldman Sachs bankers. Goldman Sachs reviewed the bids received from Vista and Thoma Bravo with the board.

During this same time period, Goldman Sachs, on behalf of Vista, was in buyout discussions with Thoma Bravo for one of Vista's portfolio companies. The board was unaware of this other concurrent negotiation between Goldman Sachs, Vista, and Thoma Bravo.

Goldman Sachs communicated a final bid deadline of July 14, 2022, for both the Avalara-Vista sale and the Vista-Thoma Bravo sale. On July 11, 2022, Thoma Bravo submitted a bid to Vista. On July 12, 2022, Thoma Bravo notified Goldman Sachs it would not submit a final bid for Avalara. Vista notified Avalara that it would not meet the deadline due to uncertain and unfavorable "general macroeconomic conditions." The board terminated the sale process on July 16, 2022.

Avalara's second quarter performance was reported on July 18, and showed 23 percent revenue growth, with above budget margins and profits ahead of guidance. Bookings were reported at $23 million below plan.

On July 19, 2022, Vista made another bid to Avalara for $91 per share. Vista's offer also included the same management provision as the first bid. Negotiations with Vista continued and McFarlane conveyed interest in receiving an offer in the range originally proposed by Vista.

On August 5, 2022, Vista verbally offered a bid of $93.50 per share. McFarlane and Tennenbaum brought the offer to the board that same day. McFarlane stated that the company faced "challenges and other headwinds . . . in executing its strategic plan." And Tennenbaum described "difficult and challenging" organizational changes. Goldman Sachs submitted a "fairness opinion" in support of the sale. Four of the financial metrics used by Goldman Sachs showed a midpoint of $97.12 per share.[6] The DCF valuation showed a midpoint lower than $93.50 per share. The projections used as input for this valuation were provided by McFarlane and Tennenbaum and were described to the board as follows, "while [the mergers and acquisitions] activity is expected to continue at roughly the current pace, the [projections do] not include any expected benefits from future acquisitions."

On August 7, the board agreed to the sale during a remote meeting and a merger agreement was signed (the merger).[7] The merger included "no-shop" provisions which prohibited Avalara from soliciting interest from other potential buyers and required

---

[6] A midpoint represents a general market value for an asset by taking the average of the current quoted bid and ask prices.

[7] Goldman Sachs calculated a price target of $109 per share on August 7, 2022.

termination of any prior or current negotiations with potential buyers. Avalara also had to keep Vista apprised of any competitive developments and should another buyer submit a bid, Vista was entitled to notice of the buyer's identity and bid terms. The merger also required that should Avalara accept another offer, Avalara would have to pay Vista a termination fee of $242,329,000.

On August 8, 2022, Avalara and Vista announced the merger where Vista would acquire Avalara for $93.50 per share of common stock—a total of $8.4 billion. Following the announcement, Avalara's stock price dropped 3.86 percent. Around the same time, it was announced that McFarlane and his team would continue to work for Vista following the merger—information that was not disclosed to the other directors when they voted to approve the sale. The merger closed on October 19, 2022, and McFarlane, Tennenbaum, and Avalara Chief Legal Officer Alesia Pinney were retained as officers. McFarlane also continued as a director. Upon closing, McFarlane and Tennenbaum received compensation of about $30.5 million and $12.7 million, respectively. Internal e-mails from August 8, 2022, between management describe the post-close opportunities:

> So much [post-close] opportunity ahead to lead, to shape careers, for financial benefit at Avalara"; "Deal gives us some insulation from volatility so we can focus on our plan"; "Vista's mindset is to help us through this phrase to where we are 2-3x in size—they [Vista] have playbooks and expertise to help us"; and "this is the right plan to reach our goals."

Following the announcement, the board received opposition from some shareholders.

The board approved the Avalara Definitive Proxy Statement on Schedule 14A (the proxy) and recommended to shareholders that they vote for the merger. The proxy

stated that "members of Avalara's senior management and the representatives of Vista did not have any substantive discussions on the role, responsibilities, or compensation of Avalara's management team following the closing." The proxy also stated that the projections were reasonable and reflected the best currently available estimates of "the expected course of action and the expected future financial performance of Avalara." The proxy included a description of Goldman Sachs's presentation at the April 2022 board meeting.

Around September 23, 2022, the board sent a document to Avalara shareholders to be incorporated by reference into the proxy (the supplement). The supplement conveyed the board "took proactive action based on degradation of business performance and considered a broad range of alternatives." The supplement expected a decline in international growth rate through 2023, and noted a weakened market demand. As for leadership, the supplement stated that leadership and team changes were required to resolve execution challenges and transform operations. The supplement also predicted that Avalara's stock would likely be under significant pressure after the second-quarter earnings.

On October 14, 2022, 66.2 percent of Avalara's shareholders voted in favor of the merger.

B

On January 24, 2023, Pipe Fitters filed a class action against the defendants for breach of fiduciary duty.[8] Pipe Fitters sought damages, quasi-appraisal, rescissory

---

[8] The complaint was first filed under seal in January 2023, then unsealed and filed on April 13, 2023.

damages, attorney fees and costs, and any further relief deemed just and proper by the trial court. Pipe Fitters' complaint alleged: (1) a flawed sale process, during which conflicted directors engaged in self-dealing conduct, that (2) resulted in undervaluation of stock, (3) the proxy was materially misleading to shareholders, and (4) the board deterred competing bids with highly restrictive deal protections.

The defendants moved to dismiss the complaint under CR 12(b)(6) for failure to state a claim upon which relief can be granted. The defendants argued that under the WBCA and Sound Infiniti, Inc. v. Snyder, 169 Wn.2d 199, 237 P.3d 241 (2010), the statutory appraisal process was the only remedy available to Pipe Fitters absent a showing of fraud or a pleading that the merger failed to comply with procedure. The defendants argued that because the shareholders failed to plead fraud and breach of fiduciary duty, the complaint should be dismissed.

The trial court denied the motion to dismiss. The trial court then granted the defendants' motion and certified for discretionary review under CR 54(b). We accepted discretionary review.

II

The trial court granted the defendants' motion to certify the following legal question for our review:

> Are minority shareholders who dissent to a corporate merger limited to the appraisal process set forth in RCW 23B.13.020 as the exclusive remedy for a claim for money damages, or are they entitled, in cases of fraud, to file suit?

A

Under RAP 2.3(b)(4), the superior court may certify for review "a controlling question of law as to which there is a substantial ground for a difference of opinion." We review certified questions of law de novo. Rowe v. Klein, 2 Wn. App. 2d 326, 332, 409 P.3d 1152 (2018). We also interpret statutes de novo. West v. Dep't of Fish & Wildlife, 21 Wn. App. 2d 435, 441, 506 P.3d 722 (2022).

Our fundamental objective when interpreting a statute is to ascertain and give effect to the legislature's intent. If the meaning of the statute is plain on its face, then we must give effect to that meaning as an expression of legislative intent. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). In doing so, the plain meaning is "discerned from all that the Legislature has said in the statute and related statutes which disclose legislative intent about the provision in question." Campbell & Gwinn, 146 Wn.2d at 11. If, after this inquiry, the statute remains ambiguous or unclear, it is appropriate to resort to canons of construction and legislative history. Campbell & Gwinn, 146 Wn.2d at 9.

Under the WBCA, shareholders are "entitled to dissent from, and obtain payment of the fair value of the shareholder's shares" when a corporation performs a corporate action such as a merger with another company. Eagleview Techs., Inc. v. Pikover, 192 Wn. App. 299, 307, 365 P.3d 1264 (2015) (quoting RCW 23B.13.020(1)).

"If a dissenter is dissatisfied with the corporation's estimate of the fair value of the shares, the dissenter may provide the corporation with his or her own estimate of the fair value of the dissenter's shares," and "if the corporation contests the estimate, it must file for an appraisal proceeding to determine the fair value of the shares." Sound

Infiniti, 169 Wn.2d at 207 (citing RCW 23B.13.280(1) and RCW 23B.13.300). The WBCA also requires that, unless the corporate action falls into one of a few limited exceptions, including fraudulent conduct, the appraisal process is the exclusive remedy:

> A shareholder entitled to dissent and obtain payment for the shareholder's shares under this chapter may not challenge the corporate action creating the shareholder's entitlement unless the action fails to comply with the procedural requirements imposed by this title, RCW 25.10.831 through 25.10.886, the articles of incorporation, or the bylaws, <u>or is fraudulent with respect to the shareholder or the corporation</u>.

RCW 23B.13.020(2) (emphasis added).

Thus, it appears from the plain language of RCW 23B.13.020(2), the statutory appraisal process is not the exclusive remedy for a shareholder to dissent and obtain payment where there is "fraudulent [conduct] with respect to the shareholder or corporation."

## B

Our Supreme Court last addressed RCW 23B.13.020(2) in Sound Infiniti. There, a minority shareholder, Afshin Pisheyar, sued two other shareholders of a closely held corporation alleging that the defendants converted corporate assets, breached fiduciary duties, and converted corporate assets. After the defendants' motion to dismiss was denied, they initiated a reverse stock split, eliminating Pisheyar as a shareholder in exchange for a cash payout. Sound Infiniti, 169 Wn.2d at 203-04. After granting and then rescinding a temporary restraining order against the stock split, the trial court dismissed Pisheyar's individual claims because the appraisal process in RCW 23B.13.020 provided the exclusive remedy. Sound Infiniti, 169 Wn.2d at 205. The trial court then certified its orders to this court for discretionary review.

-12-

This court affirmed, holding that the appraisal proceeding was Pisheyar's exclusive remedy. Sound Infiniti, Inc. v. Snyder, 145 Wn. App. 333, 186 P.3d 1107 (2008). Addressing the statutory exception for "fraudulent" actions, we interpreted RCW 23B.13.020(2) narrowly so that the exception for fraudulent actions was limited to common law actual fraud. Sound Infiniti, 145 Wn. App. at 346. And because there was no showing of common law actual fraud, we concluded that the WBCA prohibited Pisheyar's individual claims for damages outside the appraisal process. Sound Infiniti, 145 Wn. App. at 349.

Our Supreme Court disagreed with this court's narrow interpretation of fraudulent conduct, concluding that this court "erred by defining 'fraudulent' so narrowly as to encompass only common law actual fraud." Sound Infiniti, 169 Wn.2d at 208. Citing legislative history, the court explained that the fraudulent exception is not limited to common law actual fraud:

> An examination of the legislative history of RCW 23B.13.020 shows that the statute aims to make the appraisal process the usual and common means by which a dissenter can gain compensation, but does not limit the fraudulent exception to only to cases of common law actual fraud. The Senate Journal states:
>
>> "Proposed subsection 13.02(b) basically adopts the New York formula as to exclusivity of the dissenters' remedy of this chapter. The remedy is the exclusive remedy unless the transaction fails to comply with procedural requirements or is "fraudulent." . . . Thus in general terms an exclusivity principle is justified. But the prospect that shareholders may be "paid off" does not justify the corporation in proceeding without complying with procedural requirements or fraudulently. If the corporation attempts an action in violation of the corporation law on voting, in violation of clauses in articles of incorporation prohibiting it, by deception of shareholders, or in violation of a fiduciary duty—to take some examples—the court's freedom to intervene should be

> unaffected by the presence or absence of dissenters' rights under this chapter. . . . [The statute] is designed to recognize and preserve the principles that have developed in the case law of Delaware, New York and other states with regard to the effect of dissenters' rights on other remedies of dissident shareholders.  See Weinberger v. UOP, Inc., 457 A.2d 701[, 714] (Del.1983) . . . ; Walter J. Schloss Assoc[s.] v. Arkwin Indus[.], Inc., [90 A.D.2d 149,] 455 N.Y.S.2d 844, 847-52 (App. Div. 1982) (dissenting opinion), reversed, with adoption of dissenting opinion, [61 N.Y.2d 700,] 460 N.E.2d 1090[, 472 N.Y.S.2d 605] (Ct. App. 1984)."

Sound Infiniti, 169 Wn.2d at 208 (alterations in original) (quoting 2 SENATE JOURNAL, 51st Leg., 2d Spec. Sess., at 3088 (Wash. 1989)).

Relying on Delaware jurisprudence, the Supreme Court continued, explaining its basis for rejecting this court's narrow definition of "fraudulent" actions:

> Delaware's Weinberger case cited in the commentary states that "[t]he appraisal remedy . . . may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved."  457 A.2d at 714.  Our own legislative history and Delaware's influential jurisprudence both contemplate a definition of "fraudulent" broader than common law actual fraud.  We therefore hold that the Court of Appeals erred by defining the "fraudulent" exception so narrowly.  The fact that the legislature omitted the phrase "unlawful or" preceding "fraudulent" does not mean that we should limit the fraudulent exception to common law actual fraud.

Sound Infiniti, 169 Wn.2d at 208-09.

While our Supreme Court held that this court's definition was too narrow, it still required that "there must still be some showing that the corporate action itself . . . is 'fraudulent with respect to the shareholder or the corporation.'"  Sound Infiniti, 169 Wn.2d at 209 (quoting RCW 23B.13.020(2)).  Thus, the court summarized that a petitioner seeking to meet the exception in RCW 23B.13.020(2) needed to make "some showing" of fraud:

while we find that "fraudulent" does encompass actions beyond common law actual fraud, there must still be some showing of a fraudulent corporate action.

Sound Infiniti, 169 Wn.2d at 212.

The defendants argue that Sound Infiniti did more than simply define the showing necessary to meet the fraudulent exception in RCW 23B.13.020(2). This is so, they contend, because the Supreme Court also held that individual claims for money damages cannot exist outside the appraisal process. We disagree.

Defendants rely primarily on a single paragraph in Sound Infiniti where the Supreme Court discussed individual claims for damages under New York law:

New York ensures that actions for damages can be brought only within the framework of the exclusive appraisal proceeding. "An action for damages alone will not lie, since this would allow a dissenting shareholder by merely alleging fraudulent or unlawful corporate conduct, to seek therein the identical relief available to him in appraisal proceedings."

169 Wn.2d at 210-11 (quoting Walter J. Schloss Assocs., 455 N.Y.S.2d at 851-52 (Mangano, J., dissenting)).

The defendants' reliance on this paragraph fails. The Supreme Court's discussion of New York law must be read in context. The defendants ignore that in the preceding paragraph of the opinion, the Supreme Court concluded that Pisheyar failed to make a showing of fraud because his allegations of misconduct by the majority shareholders were "expressly allowed by Washington law and are not fraudulent by any definition." Sound Infiniti, 169 Wn.2d at 210. Thus, because Pisheyar failed to show fraudulent conduct, the exception to the statutory appraisal process for fraudulent

-15-

conduct was simply not applicable. Any further discussion of whether the exception applied was at best dicta.[9]

And the interpretation urged by the defendants also directly conflicts with our Supreme Court's actual holding as stated in the next paragraph:

> We hold that absent a showing of fraudulent conduct, the appraisal mechanism is the exclusive remedy Pisheyar has for his individual claims for damages.

Sound Infiniti, 169 Wn.2d at 211-12.[10] This holding was repeated two paragraphs later in the Court's summary:

> In sum, while we find that "fraudulent" does encompass actions beyond common law actual fraud, there must still be some showing of a fraudulent corporate action. Since there is no showing that the transaction was fraudulent, Pisheyar's claims for damages resulting from a breach of fiduciary duty can be litigated only within the appraisal proceeding.

Sound Infiniti, 169 Wn.2d at 212.

While perhaps confusingly stated in the negative—because the court had concluded that Pisheyar had not sufficiently pleaded fraudulent conduct—the court's holding is consistent with the plain language of RCW 23B.13.020(2): that with a showing of fraudulent conduct, individual claims for damages can proceed outside the statutory appraisal process.

---

[9] Dicta is "language not necessary to the decision in a particular case." In re Marriage of Roth, 72 Wash. App. 566, 570, 865 P.2d 43 (1994). The relevant issues in Sound Infiniti were the definition of the fraudulent conduct necessary for the statutory exemption to the appraisal process to apply, and whether Pisheyar adequately pleaded fraudulent conduct. Because the Supreme Court determined that Pisheyar had not pleaded fraudulent conduct, the language discussing actions for individual damages under New York jurisprudence was not necessary.

[10] Similarly with respect to Pisheyar's claims for equitable relief, the court held "that a separate proceeding for equitable relief is appropriate only when there is evidence of some fraud beyond the mere fact that a reverse stock split took place." Sound Infiniti, 169 Wn.2d at 212.

Consequently, we answer the certified question as follows: consistent with the plain language of RCW 23B.13.020(2), and Sound Infiniti, a shareholder entitled to dissent and obtain payment for shares under the WBCA may challenge the corporate actions outside the statutory appraisal process based on a showing that the action was fraudulent with respect to the shareholder or the corporation.

We affirm.

Mann, J.

WE CONCUR:

Birk, J.

Dwyer, J.